*539 Chief Justice Roberts
delivered the opinion of the Court.
Petitioner police officers conducted a search of respond­ents’ home pursuant to a warrant issued by a neutral Magis­trate. The warrant authorized a search for all guns and gang-related material, in connection with the investigation of a known gang member for shooting at his ex-girlfriend with a pistol-gripped sawed-off shotgun, because she had “call[ed] the cops” on him. App. 56. Respondents brought an action seeking to hold the officers personally liable under 42 U. S. C. § 1983, alleging that the search violated their Fourth Amendment rights because there was not sufficient probable cause to believe the items sought were evidence of a crime. In particular, respondents argued that there was no basis to search for all guns simply because the suspect owned and had used a sawed-off shotgun, and no reason to search for gang material because the shooting at the ex-­girlfriend for “calling] the cops” was solely a domestic dis­pute. The Court of Appeals for the Ninth Circuit held that the warrant was invalid, and that the officers were not enti­tled to immunity from personal liability because this invalid­ity was so obvious that any reasonable officer would have recognized it, despite the Magistrate’s approval. We dis­agree and reverse.
I
A
Shelly Kelly decided to break off her romantic relationship with Jerry Ray Bowen and move out of her apartment, to which Bowen had a key. Kelly feared an attack from *540 Bowen, who had previously assaulted her and had been con­victed of multiple violent felonies. She therefore asked of­ficers from the Los Angeles County Sheriff’s Department to accompany her while she gathered her things. Deputies from the sheriff’s department came to assist Kelly but were called away to respond to an emergency before the move was complete..
As soon as the officers left, an enraged Bowen appeared at the bottom of the stairs to the apartment, yelling “I told you to never call the cops on me bitch!” App. 39, 56. Bowen then ran up the stairs to Kelly, grabbed her by her shirt, and tried to throw her over the railing of the second-­story landing. When Kelly successfully resisted, Bowen bit her on the shoulder and attempted to drag her inside the apartment by her hair. Kelly again managed to escape Bowen’s grasp, and ran to her car. By that time, Bowen had retrieved a black sawed-off shotgun with a pistol grip. He ran in front of Kelly’s car, pointed the shotgun at her, and told Kelly that if she tried to leave he would kill her. Kelly leaned over, fully depressed the gas pedal, and sped away. Bowen fired at the car a total of five times, blowing out the car’s left front tire in the process, but Kelly managed to escape.
Kelly quickly located police officers and reported the as­sault. She told the police what had happened — that Bowen had attacked her after becoming “angry because she had called the Sheriff’s Department” — and she mentioned that Bowen was “an active member of the ‘Mona Park Crips,’ ” a local street gang. Id., at 39. Kelly also provided the offi­cers with photographs of Bowen.
Detective Curt Messerschmidt was assigned to investigate the incident. Messerschmidt met with Kelly to obtain de­tails of the assault and information about Bowen. Kelly de­scribed the attack and informed Messerschmidt that she thought Bowen was staying at his foster mother’s home at *541 2234 East 120th Street. Kelly also informed Messerschmidt of Bowen’s previous assaults on her and of his gang ties.
Messerschmidt then conducted a background check on Bowen by consulting police records, California Department of Motor Vehicles records, and the “cal-gang” database. Based on this research, Messerschmidt confirmed Bowen’s connection to the 2234 East 120th Street address. He also confirmed that Bowen was an “active” member of the Mona Park Crips and a “secondary” member of the Dodge City Crips. Id., at 64. Finally, Messerschmidt learned that Bowen had been arrested and convicted for numerous violent and firearm-related offenses. Indeed, at the time of the in­vestigation, Bowen’s “rapsheet” spanned over 17 printed pages, and indicated that he had been arrested at least 31 times. Nine of these arrests were for firearms offenses and six were for violent crimes, including three arrests for as­sault with a deadly weapon (firearm). Id., at 72-81.
Messerschmidt prepared two warrants: one to authorize Bowen’s arrest and one to authorize the search of 2234 East 120th Street. An attachment to the search warrant de­scribed the property that would be the object of the search:
“All handguns, rifles, or shotguns of any caliber, or any firearms capable of firing ammunition, or firearms or de­vices modified or designed to allow it [sic] to fire ammu­nition. All caliber of ammunition, miscellaneous gun parts, gun cleaning kits, holsters which could hold or have held any caliber handgun being sought. Any re­ceipts or paperwork, showing the purchase, ownership, or possession of the handguns being sought. Any fire­arm for which there is no proof of ownership. Any firearm capable of firing or chambered to fire any cali­ber ammunition.
“Articles of evidence showing street gang membership or affiliation with any Street Gang to include but not limited to any reference to ‘Mona Park Crips’, including *542 writings or graffiti depicting gang membership, activity or identity. Articles of personal property tending to establish the identity of person {sic} in control of the premise or premises. Any photographs or photograph albums depicting persons, vehicles, weapons or loca­tions, which may appear relevant to gang membership, or which may depict the item being sought and or be­lieved to be evidence in the case being investigated on this warrant, or which may depict evidence of criminal activity. Additionally to include any gang indicia that would establish the persons being sought in this war­rant, affiliation or membership with the ‘Mona Park Crips’ street gang.” Id., at 52.
Two affidavits accompanied Messerschmidt’s warrant ap­plications. The first affidavit described Messerschmidt’s ex­tensive law enforcement experience, including that he had served as a peace officer for 14 years, that he was then as­signed to a “specialized unit” “investigating gang related crimes and arresting gang members for various violations of the law,” that he had been involved in “hundreds of gang related incidents, contacts, and or arrests” during his time on the force, and that he had “received specialized training in the field of gang related crimes” and training in “gang related shootings.” Id., at 53-54,
The second affidavit — expressly incorporated into the search warrant — explained why Messerschmidt believed there was sufficient probable cause to support the warrant. That affidavit described the facts of the incident involving Kelly and Bowen in great detail, including the weapon used in the assault. The affidavit recounted that Kelly had iden­tified Bowen as the assailant and that she thought Bowen might be found at 2234 East 120th Street. It also reported that Messerschmidt had “conducted an extensive background search on the suspect by utilizing departmental records, state computer records, and other police agency records,” *543 and that from that information he had concluded that Bowen resided at 2234 East 120th Street. Id., at 58.
The affidavit requested that the search warrant be en­dorsed for night service because “information provided by the victim and the cal-gang data base” indicated that Bowen had “gang ties to the Mona Park Crip gang” and that “night service would provide an added element of safety to the com­munity as well as for the deputy personnel serving the war­rant.” Id., at 59. The affidavit concluded by noting that Messerschmidt “believe[d] that the items sought” would be in Bowen’s possession and that “recovery of the weapon could be invaluable in the successful prosecution of the sus­pect involved in this case, and the curtailment of further crimes being committed.” Ibid.
Messerschmidt submitted the warrants to his supervi­sors — Sergeant Lawrence and Lieutenant Ornales — for re­view. Deputy District Attorney Janet Wilson also reviewed the materials and initialed the search warrant, indicating that she agreed with Messerschmidt’s assessment of proba­ble cause. Id., at 27, 47. Finally, Messerschmidt submitted the warrants to a Magistrate. The Magistrate approved the warrants and authorized night service.
The search warrant was served two days later by a team of officers that included Messerschmidit and Lawrence. Sheriff’s deputies forced open the front door of 2234 East 120th Street and encountered Augusta Millender — a woman in her seventies — and Millender’s daughter and grandson. As instructed by the police, the Millenders went outside while the residence was secured but remained in the living room while the search was conducted. Bowen was not found in the residence. The search did, however, result in the seizure of Augusta Millender’s shotgun, a California Social Services letter addressed to Bowen, and a box of .45-­caliber ammunition.
Bowen was arrested two weeks later after Messerschmidt found him hiding under a bed in a motel room.
*544 B
The Millenders filed suit in Federal District Court against the County of Los Angeles, the sheriff’s department, the sheriff, and a number of individual officers, including Messer­schmidt and Lawrence. The complaint alleged, as relevant here, that the search warrant was invalid under the Fourth Amendment. It sought damages from Messerschmidt and Lawrence, among others.
The parties filed cross-motions for summary judgment on the validity of the search warrant. The District Court found the warrant defective in two respects. The District Court concluded that the warrant’s authorization to search for firearms was unconstitutionally overbroad because the “crime specified here was a physical assault with a very spe­cific weapon” — a black sawed-off shotgun with a pistol grip— negating any need to “search for all firearms.” Millender v. County of Los Angeles, Civ. No. 05-2298 (CD Cal., Mar. 15, 2007), App. to Pet. for Cert. 106, 157, 2007 WL 7589200, *21. The court also found the warrant overbroad with respect to the search for gang-related materials, because there “was no evidence that the crime at issue was gang-related.” App. to Pet. for Cert. 157. As a result, the District Court granted summary judgment to the Millenders on their constitutional challenges to the firearm and gang material aspects of the search warrant. Id., at 160. The District Court also re­jected the officers’ claim that they were entitled to qualified immunity from damages. Id., at 171.
Messerschmidt and Lawrence appealed, and a divided panel of the Court of Appeals for the Ninth Circuit reversed the District Court’s denial of qualified immunity. Millen-­der v. County of Los Angeles, 564 F. 3d 1143 (2009). The court held that the officers were entitled to qualified immu­nity because “they reasonably relied on the approval of the warrant by a deputy district attorney and a judge.” Id., at 1145.
*545 The Court of Appeals granted rehearing en banc and af­firmed the District Court’s denial of qualified immunity. Millender v. County of Los Angeles, 620 F. 3d 1016 (2010). The en banc court concluded that the warrant’s authorization was unconstitutionally overbroad because the affidavit and the warrant failed to “establish[] probable cause that the broad categories of firearms, firearm-related material, and gang-related material described in the warrant were contra­band or evidence of a crime.” Id., at 1033. In the en banc court’s view, “the deputies had probable cause to search for a single, identified weapon .... They had no probable cause to search for the broad class of firearms and firearm-related materials described in the warrant.” Id., at 1027. In addi­tion, “[b]ecause the deputies failed to establish any link be­tween gang-related materials and a crime, the warrant au­thorizing the search and seizure of all gang-related evidence [was] likewise invalid.” Id., at 1031. Concluding that “a reasonable officer in the deputies’ position would have been well aware of this deficiency,” the en banc court held that the officers were not entitled to qualified immunity. Id., at 1033-1035.
There were two separate dissenting opinions. Judge Cal­lahan determined that “the officers had probable cause to search for and seize any firearms in the home in which Bowen, a gang member and felon, was thought to reside.” Id., at 1036. She also concluded that “the officers reason­ably relied on their superiors, the district attorney, and the magistrate to correct” any overbreadth in the warrant, and that the officers were entitled to qualified immunity because their actions were not objectively unreasonable. Id., at 1044,1049. Judge Silverman also dissented, concluding that the “deputies’ belief in the validity of . . . the warrant was entirely reasonable” and that the “record [wa]s totally devoid of any evidence that the deputies acted other than in good faith.” Id., at 1050. Judge Tallman joined both dissents.
We granted certiorari. 564 U. S. 1035 (2011).
*546 H — I i — i
The Millenders allege that they were subjected to an un­reasonable search in violation of the Fourth Amendment be­cause the warrant authorizing the search of their home was not supported by probable cause. They seek damages from Messerschmidt and Lawrence for their roles in obtaining and executing this warrant. The validity of the warrant is not before us. The question instead is whether Messerschmidt and Lawrence are entitled to immunity from damages, even assuming that the warrant should not have been issued.
“The doctrine of qualified immunity protects government officials ‘from liability for civil damages insofar as their con­duct does not violate clearly established statutory or consti­tutional rights of which a reasonable person would have known/” Pearson v. Callahan, 555 U. S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U. S. 800, 818 (1982)). Qualified immunity “gives government officials breathing room to make reasonable but mistaken judgments,” and “protects ‘all but the plainly incompetent or those who know­ingly violate the law/” Ashcroft v. al-Kidd, 563 U. S. 731, 743 (2011) (quoting Malley v. Briggs, 475 U. S. 335, 341 (1986)). “[Wjhether an official protected by qualified immu­nity may be held personally liable for an allegedly unlawful official action generally turns on the ‘objective legal reason­ableness’ of the action, assessed in light of the legal rules that were ‘clearly established’ at the time it was taken.” Ander­son v. Creighton, 483 U. S. 635, 639 (1987) (citation omitted).
Where the alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the clearest indi­cation that the officers acted in an objectively reasonable manner or, as we have sometimes put it, in “objective good faith.” United States v. Leon, 468 U. S. 897, 922-923 (1984).[1] *547 Nonetheless, under our precedents, the fact that a neutral magistrate has issued a warrant authorizing the allegedly unconstitutional search or seizure does not end the inquiry into objective reasonableness. Rather, we have recognized an exception allowing suit when “it is obvious that no reason­ably competent officer would have concluded that a warrant should issue.” Malley, 475 U. S., at 341. The “shield of im­munity” otherwise conferred by the warrant, id., at 345, will be lost, for example, where the warrant was “based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable,” Leon, 468 U. S., at 923 (internal quotation marks omitted).[2]
Our precedents make clear, however, that the threshold for establishing this exception is a high one, and it should be. As we explained in Leon, “[i]n the ordinary case, an officer cannot be expected to question the magistrate’s probable-cause determination” because “[i]t is the magis­trate’s responsibility to determine whether the officer’s alle­gations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment.” Id., at 921; see also Malley, supra, at 346, n. 9 (“It is a sound presumption that the magistrate is more qualified than the police officer to make a probable cause de­termination, and it goes without saying that where a magis­ *548 trate acts mistakenly in issuing a warrant but within the range of professional competence of a magistrate, the officer who requested the warrant cannot be held liable” (internal quotation marks and citation omitted)).
I — I h-i
The Millenders contend, and the Court of Appeals held, that their case falls into this narrow exception. According to the Millenders, the officers “failed to provide any facts or circumstances from which a magistrate could properly con­clude that there was probable cause to seize the broad classes of items being sought,” and “[n]o reasonable officer could have presumed that such a warrant was valid.” Brief for Respondents 27. We disagree.
A
With respect to the warrant’s authorization to search for and seize all firearms, the Millenders argue that “a reason­ably well-trained officer would have readily perceived that there was no probable cause to search the house for all fire­arms and firearm-related items.” Id., at 32. Noting that “the affidavit indicated exactly what item was evidence of a crime — the 'black sawed off shotgun with a pistol grip,’” they argue that “[n]o facts established that Bowen possessed any other firearms, let alone that such firearms (if they ex­isted) were 'contraband or evidence of a crime.’” Ibid. (quoting App. 56).
Even if the scope of the warrant were overbroad in author­izing a search for all guns when there was information only about a specific one, that specific one was a sawed-off shot­gun with a pistol grip, owned by a known gang member, who had just fired the weapon five times in public in an attempt to murder another person, on the asserted ground that she had “call[ed] the cops” on him. Id., at 56. Under these circumstances — set forth in the warrant — it would not have been unreasonable for an officer to conclude that there was *549 a “fair probability” that the sawed-off shotgun' was not the only firearm Bowen owned. Illinois v. Gates, 462 U. S. 213, 238 (1983). And it certainly would have been reasonable for an officer to assume that Bowen’s sawed-off shotgun was illegal. Cf. 26 U. S. C. § 15845(a), 5861(d). Evidence of one crime is not always evidence of several, but given Bowen’s possession of one illegal gun, his gang membership, his will­ingness to use the gun to kill someone, and his concern about the police, a reasonable officer could conclude that there would be additional illegal guns among others that Bowen owned.[3]
A reasonable officer also could believe that seizure of the firearms was necessary to prevent further assaults on Kelly. California law allows a magistrate to issue a search warrant for items “in the possession of any person with the intent to use them as a means of committing a public offense,” Cal. Penal Code Ann. § 1524(a)(3) (West 2011), and the warrant application submitted by the officers specifically referenced this provision as a basis for the search, App. 48. Bowen had already attempted to murder Kelly once with a firearm, and had yelled “I’ll kill you” as she tried to escape from him. Id., at 56-57. A reasonable officer could conclude that Bowen would make another attempt on Kelly’s life and that he possessed other firearms “with the intent to use them” to that end. § 1524(a)(3).
Given the foregoing, it would not have been “entirely un­reasonable” for an officer to believe, in the particular circum­stances of this case, that there was probable cause to search for all firearms and firearm-related materials. Leon, supra, at 923 (internal quotation marks omitted).
With respect to the warrant’s authorization to search for evidence of gang membership, the Millenders contend that *550 “no reasonable officer could have believed that the affidavit presented to the magistrate contained a sufficient basis to conclude that the gang paraphernalia sought was contraband or evidence of a crime.” Brief for Respondents 28. They argue that “the magistrate [could not] have reasonably con­cluded, based on the affidavit, that Bowen’s gang member­ship had anything to do with the crime under investigation” because “[t]he affidavit described a ‘spousal assault’ that ensued after Kelly decided to end her ‘on going dating re­lationship’ with Bowen” and “[njothing in that description suggests that the crime was gang-related.” Ibid, (quoting App. 55).
This effort to characterize the case solely as a domestic dispute, however, is misleading. Cf. post, at 564 (Soto-­mayor, J., dissenting); post, at 558 (Kagan, J., concurring in part and dissenting in part). Messerschmidt began his affidavit in support of the warrant by explaining that he “has been investigating an assault with a deadly weapon incident” and elaborated that the crime was a “spousal assault and an assault with a deadly weapon.” App. 55 (emphasis added). The affidavit also stated that Bowen was “a known Mona Park Crip gang member” “based on information provided by the victim and the cal-gang database,”[4] and that he had attempted to murder Kelly after becoming enraged that she had “call[ed] the cops on [him].” Id., at 56, 58-59. A rea­sonable officer could certainly view Bowen’s attack as moti­vated not by the souring of his romantic relationship with Kelly but instead by a desire to prevent her from disclosing details of his gang activity to the police. She was, after all, *551 no longer linked with him as a girlfriend; he had assaulted her in the past; and she had indeed called the cops on him. And, as the affidavit supporting the warrant made clear, Kelly had in fact given the police information about Bowen’s gang ties. Id., at 59.[5]
It would therefore not have been unreasonable — based on the facts set out in the affidavit — for an officer to believe that evidence regarding Bowen’s gang affiliation would prove helpful in prosecuting him for the attack on Kelly. See War­den, Md. Penitentiary v. Hayden, 387 U. S. 294, 307 (1967) (holding that the Fourth Amendment allows a search for evi­dence when there is “probable cause ... to believe that the evidence sought will aid in a particular apprehension or con­viction”). Not only would such evidence help to establish motive, either apart from or in addition to any domestic dis­pute, it would also support the bringing of additional, related charges against Bowen for the assault. See, e. g., Cal. Penal Code Aim. § 136.1(b)(1) (West 1999) (It is a crime to “at­tempt[ ] to prevent or dissuade another person who has been the victim of a crime or who is witness to a crime from . . . [m]aking any report of that victimization to any . . . law en­forcement officer”).[6]
*552 In addition, a reasonable officer could believe that evidence demonstrating Bowen’s membership in a gang might prove help&l in impeaching Bowen or rebutting various defenses he could raise at trial. For example, evidence that Bowen had ties to a gang that uses guns such as the one he used to assault Kelly would certainly be relevant to establish that he had familiarity with or access to this type of weapon.
Moreover, even if this were merely a domestic dispute, a reasonable officer could still conclude that gang parapherna­lia found at the Millenders’ residence would aid in the prose­cution of Bowen by, for example, demonstrating Bowen’s connection to other evidence found there. The warrant authorized a search for “any gang indicia that would estab­lish the persons being sought in this warrant,” and “[ajrticles of personal property tending to establish the identity of [the] person in control of the premise or premises.” App. 52. Before the District Court, the Millenders “acknowledge^] that evidence of who controlled the premises would be rele­vant if incriminating evidence were found and it became nec­essary to tie that evidence to a person,” and the District Court approved that aspect of the warrant on this basis. App. to Pet. for Cert. 158-159 (internal quotation marks omitted). Given Bowen’s known gang affiliation, a reason­able officer could conclude that gang paraphernalia found at the residence would be an effective means of demonstrating Bowen’s control over the premises or his connection to evi­dence found there.[7]
*553 Whatever the use to which evidence of Bowen’s gang involvement might ultimately have been put, it would not have been “entirely unreasonable” for an officer to believe that the facts set out in the affidavit established a fair proba­bility that such evidence would aid the prosecution of Bowen for the criminal acts at issue. Leon, 468 U. S., at 923 (inter­nal quotation marks omitted).
B
Whether any of these facts, standing alone or taken to­gether, actually establish probable cause is a question we need not decide. Qualified immunity “gives government officials breathing room to make reasonable but mistaken judgments.” al-Kidd, 563 U. S., at 743. The officers’ judg­ment that the scope of the warrant was supported by proba­ble cause may have been mistaken, but it was not “plainly incompetent.” Malley, 475 U. S., at 341.
On top of all this, the fact that the officers sought and obtained approval of the warrant application from a superior and a deputy district attorney before submitting it to the Magistrate provides further support for the conclusion that an officer could reasonably have believed that the scope of the warrant was supported by probable cause. Ibid. Be­fore seeking to have the warrant issued by a magistrate, Messerschmidt conducted an extensive investigation into Bowen’s background and the facts of the crime. Based on this investigation, Messerschmidt prepared a detailed war­rant application that truthfully laid out the pertinent facts. *554 The only facts omitted — the officers’ knowledge of Bowen’s arrest and conviction records, see supra, at 541 — would only have strengthened the warrant. Messerschmidt then sub­mitted the warrant application for review by Lawrence, an­other superior officer, and a deputy district attorney, all of whom approved the application without any apparent mis­givings. Only after this did Messerschmidt seek the ap­proval of a neutral Magistrate, who issued the requested warrant. The officers thus “took every step that could rea­sonably be expected of them.” Massachusetts v. Sheppard, 468 U. S. 981, 989 (1984). In light of the foregoing, it cannot be said that “no officer of reasonable competence would have requested the warrant.” Malley, 475 U. S., at 346, n. 9. In­deed, a contrary conclusion would mean not only that Mes­serschmidt and Lawrence were “plainly incompetent,” id., at 341, but that their supervisor, the deputy district attorney, and the Magistrate were as well.
The Court of Appeals, however, gave no weight to the fact that the warrant had been reviewed and approved by the officers’ superiors, a deputy district attorney, and a neutral Magistrate. Relying on Malley, the court held that the officers had an “independent responsibility to ensure there [was] at least a colorable argument for probable cause.” 620 F. 3d, at 1034. It explained that “[t]he deputies here had a responsibility to exercise their reasonable professional judg­ment,” and that “in circumstances such as these a neutral magistrate’s approval (and, a fortiori, a non-neutral prose­cutor's) cannot absolve an officer of liability.” Ibid, (cita­tion omitted).
We rejected in Malley the contention that an officer is automatically entitled to qualified immunity for seeking a warrant unsupported by probable cause, simply because a magistrate had approved the application. 475 U. S., at 345. And because the officers’ superior and the deputy district attorney are part of the prosecution team, their review also cannot be regarded as dispositive. But by holding in Malley *555 that a magistrate’s approval does not automatically render an officer’s conduct reasonable, we did not suggest that ap­proval by a magistrate or review by others is irrelevant to the objective reasonableness of the officers’ determination that the warrant was valid. Indeed, we expressly noted that we were not deciding “whether [the officer’s] conduct in [that] case was in fact objectively reasonable.” Ibid., n. 8. The fact that the officers secured these approvals is certainly pertinent in assessing whether they could have held a rea­sonable belief that the warrant was supported by probable cause.
C
In holding that the warrant in this case was so obviously defective that no reasonable officer could have believed it was valid, the court below relied heavily on our decision in Groh v. Ramirez, 540 U. S. 551 (2004), but that precedent is far afield. There, we held that officers who carried out a warrant-approved search were not entitled to qualified im­munity because the warrant in question failed to describe the items to be seized at all. Id., at 557. We explained that “[i]n the portion of the form that called for a description of the ‘person or property’ to be seized, [the applicant] typed a description of [the target’s] two-story blue house rather than the alleged stockpile of firearms.” Id., at 554. Thus, the warrant stated nonsensically that “‘there is now con­cealed [on the specified premises] a certain person or prop­erty, namely [a] single dwelling residence two story in height which is blue in color and has two additions attached to the east.’ ” Id., at 554-555, n. 2 (bracketed material in original). Because “even a cursory reading of the warrant in [that] case — perhaps just a simple glance — would have revealed a glaring deficiency that any reasonable police officer would have known was constitutionally fatal,” id., at 564, we held that the officer was not entitled to qualified immunity.
The instant case is not remotely similar. In contrast to Groh, any defect here would not have been obvious from the *556 face of the warrant. Rather, any arguable defect would have become apparent only upon a close parsing of the war­rant application, and a comparison of the affidavit to the terms of the warrant to determine whether the affidavit es­tablished probable cause to search for all the items listed in the warrant. This is not an error that “just a simple glance” would have revealed. Ibid. Indeed, unlike in Groh, the officers here did not merely submit their application to a magistrate. They also presented it for review by a superior officer, and a deputy district attorney, before submitting it to the Magistrate. The fact that none of the officials who reviewed the application expressed concern about its validity demonstrates that any error was not obvious. Groh plainly does not control the result here.
⅜* ⅝ ⅝
The question in this case is not whether the Magistrate erred in believing there was sufficient probable cause to sup­port the scope of the warrant he issued. It is instead whether the Magistrate so obviously erred that any reason­able officer would have recognized the error. The occasions on which this standard will be met may be rare, but so too are the circumstances in which it will be appropriate to im­pose personal liability on a lay officer in the face of judicial approval of his actions. Even if the warrant in this case were invalid, it was not so obviously lacking in probable cause that the officers can be considered “plainly incompe­tent” for concluding otherwise. Malley, supra, at 341. The judgment of the Court of Appeals denying the officers quali­fied immunity must therefore be reversed.

It is so ordered.

 Although Leon involved the proper application of the exclusionary rule to remedy a Fourth Amendment violation, we have held that “the same standard of objective reasonableness that we applied in the context of a *547 suppression hearing in Leon defines the qualified immunity accorded an officer” who obtained or relied on an allegedly invalid warrant. Malley v. Briggs, 475 U. S. 335,344 (1986) (citation omitted); Groh v. Ramirez, 540 U. S. 551, 565, n. 8 (2004).

 The dissent relies almost entirely on facts outside the affidavit, includ­ing Messerschmidt’s deposition testimony, post, at 563, 569 (opinion of So-­tomayor, J.), crime analysis forms, post, at 563, Kelly’s interview, post, at 564-565, and n. 5, Messerschmidt’s notes regarding Kelly’s interview, post, at 564-565, n. 5, and even several briefs filed in the District Court and the Court of Appeals, post, at 566, 570. In contrast, the dissent cites the probable-cause affidavit itself only twice. See post, at 570-571. There is no contention before us that the affidavit was misleading in omitting any of the facts on which the dissent relies. Cf. Leon, 468 U. S., at 923.

 The dissent caricatures our analysis as being that “because Bowen fired one firearm, it was reasonable for the police to conclude . . . that [he] must have possessed others,” post, at 569 (opinion of Sotomayor, J.). This simply avoids coming to grips with the facts of the crime at issue.

 Although the cal-gang database states that information contained therein cannot be used to establish probable cause, see App. 64, the affi­davit makes clear that Kelly also provided this information to Messer­schmidt, id., at 59, as she did to the deputies who initially responded to the attack, id., at 39 (describing Kelly’s statement that Bowen was “an active member of the ‘Mona Park Crips’ ”). We therefore need not decide whether the cal-gang database’s disclaimer is relevant to Fourth Amend­ment analysis.

 Contrary to the dissent’s suggestion, see post, at 564-565, n. 5 (opinion of Sotomayor, J.), the affidavit’s account of Bowen’s statements is consist­ent with other accounts of the confrontation, in particular the report pre­pared by the officers who spoke with Kelly immediately after the attack. See App. 39 (stating that when Bowen “appeared at the base of the stairs and began yelling at [Kelly,] [h]e was angry because she had called the Sheriff’s Department”). And at no point during this litigation has the accuracy of the affidavit’s account of the attack been called into question.

 The dissent relies heavily on Messersehmidt’s deposition, in which he stated that Bowen’s crime was not a “gang crime.” See post, at 562, 563, 565-566. Messerschmidt’s belief about the nature of the crime, however, is not information he possessed but a conclusion he reached based on information known tó him. See Anderson v. Creighton, 483 U. S. 635, 641 (1987). We have “eschew[ed] inquiries into the subjective beliefs of law enforcement officers who seize evidence pursuant to a subsequently invali­dated warrant.” United States v. Leon, 468 U. S. 897,922, n. 23 (1984); see also Harlow v. Fitzgerald, 457 U. S. 800, 815-819 (1982). In any event, as *552 the dissent recognizes, the inquiry under our precedents is whether “a reasonably well-trained officer in petitioner’s position would have known that his affidavit failed to establish probable cause.” Malley, 475 U. S., at 345 (emphasis added). Messerschmidt’s own evaluation does not an­swer the question whether it would have been unreasonable for an officer to have reached a different conclusion from the facts in the affidavit. See n. 2, supra.

 The Fourth Amendment does not require probable cause to believe evidence will conclusively establish a fact before permitting a search, but only “probable cause ... to believe that the evidence sought will aid in *553 a particular apprehension or conviction.” Warden, Md. Penitentiary v. Hayden, 387 U. S. 294, 307 (1967) (emphasis added). Even if gang evi­dence might have turned out not to be conclusive because other members of the Millender household also had gang ties, see post, at 567 (opinion of Sotomayor, J.); post, at 558 (opinion of Kagan, J.), a reasonable officer could still conclude that evidence of gang membership would help show Bowen’s connection to the residence. Such evidence could, for example, have displayed Bowen’s gang moniker (“C Jay”) or could have been identi­fied by Kelly as belonging to Bowen. See App. 64.