# United States Court of Appeals for the Fifth Circuit

———————

No. 23-40652

———————

United States Court of Appeals
Fifth Circuit

**FILED**

February 11, 2026

Lyle W. Cayce
Clerk

United States of America,

*Plaintiff—Appellant*,

*versus*

Xavier Jerel Leonard,

*Defendant—Appellee*.

———————————————————————

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 9:22-CR-38-1

———————————————————————

Before Elrod, *Chief Judge*, and Oldham and Wilson, *Circuit Judges*.
Per Curiam:

Pursuant to a valid warrant, officers entered a home and seized drugs, cash, and two guns. In the ensuing criminal prosecution, the defendant filed a motion to suppress. The defendant's original attorney deemed the motion "frivolous." But the magistrate judge disagreed. She suggested the district court should wield the judge-made exclusionary rule to suppress the evidence. The district court obliged. We reverse.

No. 23-40652

I

A

The Crockett Police Department received a call that a man was sprawled on the ground in a residential area. When officers arrived on the scene, they spotted a group of concerned neighbors gathered around a 400-pound man. The large man was thrashing about on the grass near the road in nothing but torn underwear.

That man was Xavier Leonard. And it is obvious from the officers' bodycam videos that Leonard was in dire straits. His body was bloodied and bruised. And his only response to questioning was to grunt and flail. After the officers struggled for a few minutes to keep Leonard from smashing his head on the pavement, someone noted that Leonard "smell[ed] like PCP." Gov't Ex. 1 at 6:53–55. Officer Kerri Bell, a former EMT who had taken charge of the situation, agreed: "He's high. Super high." *Id.* at 6:53–7:02.

Meanwhile, Deputy Juan Noyola arrived. Deputy Noyola was not part of Crockett PD. He was from the Houston County Sherriff's Office. Deputy Noyola, who had grown up in the area, identified Leonard. A woman present at the scene claimed Leonard was her neighbor and that she had never seen him act this way before. With Deputy Noyola's help, the officers realized that Leonard's home was just down the street. So Deputy Noyola went to look around.

Deputy Noyola noticed that a side door to the house had been left open. He radioed Officer Bell, who went to assist. Deputy Noyola knocked on the open door and announced: "Crockett PD!" Gov't Ex. 1 at 9:20–40.

Silence.

2

No. 23-40652

Drawing her weapon, Officer Bell peeked through the cracked door. The inside of the home was in disarray. Among other things, Officer Bell could see a broken coffee table.



The officers entered. Officer Bell proceeded room by room, shouting, "Police Department, if you're in here, make yourself known!" Gov't Ex. 1 at 9:20–11:26. Upon entering the main bedroom, she spotted a gun on the bed. She then opened the closet. "Marijuana plants," she murmured. *Id.* at

10:15–25. In the next bedroom, she found a tent with marijuana plants and multiple containers for PCP or meth. Officer Bell then announced that she would "check[]" the remainder of the potential hiding spots in the home "for safety, and then" they would get "out." Gov't Ex. 1 at 11:00–23. The officers were in the home for under two minutes.

## B

Officer Bell then prepared an application for a search warrant. "For safety," she explained, "and to ensure there were no suspects hiding or further victims in need of immediate medical attention, the deputy and I made entry into the residence through the open door." ROA.368. A state judge signed the warrant to search for narcotics, contraband, cash, and firearms. Law enforcement searched Leonard's home and seized, *inter alia*, marijuana plants, marijuana, other drugs, cash, and two guns.

Leonard was charged with one count of possession of a firearm by a felon under 18 U.S.C. § 922(g)(1) and one count of possession of a firearm in furtherance of a drug-trafficking crime under 18 U.S.C. § 924(c). Leonard wanted his attorney to move to suppress the fruits of the search of his home. But the attorney told Leonard that "would be frivolous." ROA.227–28. After the attorney informed the court, the court appointed Leonard a new attorney. Leonard's new attorney filed the motion to suppress.

A magistrate judge held a hearing and issued a report recommending that the district court grant Leonard's motion. The district court adopted the magistrate's recommendation and suppressed the evidence.

The Government appealed. On appeal, it does not contest the merits of the Fourth Amendment issue. It argues only that the exclusionary rule does not apply.

No. 23-40652

## II

The exclusionary rule is a disfavored judge-made remedy, which should be used only as a "last resort." *Hudson v. Michigan*, 547 U.S. 586, 591 (2006). It also has many exceptions. For example, unlawfully obtained evidence might nevertheless be admissible under the good faith exception. *See United States v. Leon*, 468 U.S. 897, 908, 922 (1984).

The good faith exception has several offshoots. Relevant here, is our court's "close enough" doctrine. *See United States v. Massi*, 761 F.3d 512 (5th Cir. 2014). Evidence is admissible if the officer's conduct that led to the information in the warrant affidavit was "'close enough to the line of validity' that an objectively reasonable officer . . . would believe that the information" gathered "was not tainted by unconstitutional conduct." *Id.* at 528. That standard is susceptible to valid criticism. *See post*, at 14–16 (OLDHAM, J., concurring). But it is what it is.

No matter how we define that "close enough" standard, it's clearly met here. A large man was half-naked and thrashing about on the ground in a residential neighborhood. He was bruised and bloodied. The people nearby did not know Leonard; they knew only that he had come stumbling up the road before falling. The man himself lacked the wherewithal to offer any further explanation, such as whether he was attacked or was suffering from a medical crisis. All he could do was groan in apparent pain and torment in response to questioning. The officers sought to care for the man in his disturbed and pitiable condition by protecting his head from smashing against the ground and calling emergency medical services. The officers eventually determined that the man's house was nearby. When they went over to look, they noticed a door to that house had been left open. Through that door, the officers could see a broken coffee table, suggesting a violent struggle had occurred inside. Before entering, they knocked and announced their presence

5

as required under the Fourth Amendment. They heard only silence. So they entered.

It doesn't matter whether the officers entered Leonard's home to clear the area of Leonard's possible attacker, identify other potential victims of an attack, or to find someone with information that could help with Leonard's medical care. Any of those reasons could qualify as an exigent circumstance. *See, e.g.*, *Michigan v. Fisher*, 558 U.S. 45, 49 (2009) (warrantless entry may be justified where "there [is] an objectively reasonable basis for believing that medical assistance was needed, or persons were in danger" (quotation omitted)). The "mere possibility" that an assailant, victim, or critical medical information was inside the home won't always satisfy the Fourth Amendment, but the officers could have reasonably believed it was enough here given the circumstances. *United States v. McClain*, 444 F.3d 556, 563, 565–66 (6th Cir. 2005) (quotation omitted) (concluding that an ajar front door was not enough to create probable cause of a crime occurring inside, but officers were not objectively unreasonable for suspecting as much). That reasonable belief is all that's required under the "close enough" variant of the good faith exception.

REVERSED and REMANDED for further proceedings consistent with this opinion.

No. 23-40652

Andrew S. Oldham, *Circuit Judge*, joined by Wilson, *Circuit Judge*, concurring:

I agree that Leonard's motion to suppress should be denied. But our circuit's interpretation of the good faith exception under *United States v. Massi*, 761 F.3d 512 (5th Cir. 2014), leaves much to be desired. I would clarify when an officer's conduct is "close enough to the line of validity" that we will allow officers to rely on a valid warrant, even though it was obtained using unlawfully acquired information. *Id.* at 528.

I first (I) walk through the history of the exclusionary rule. Then, I (II) explain why we should define the "close enough" standard in reference to the objective reasonableness inquiry we use in qualified immunity cases.

I

As the Supreme Court has repeatedly cautioned, the exclusionary rule is a disfavored judge-made remedy, which should be used only as a "last resort." *Hudson v. Michigan*, 547 U.S. 586, 591 (2006). Here, I (A) explain the tension between the exclusionary rule and the Constitution's text and history. Then, I explain the (B) rise and the (C) fall of the exclusionary rule.

A

As the Supreme Court has told us, the exclusionary rule has no basis in the Constitution's text. *See Davis v. United States*, 564 U.S. 229, 236–238 (2011) (The Fourth Amendment "says nothing about suppressing evidence."); *see also* Richard M. Re, *The Due Process Exclusionary Rule*, 127 Harv. L. Rev. 1885, 1889 (2014) ("Fourth Amendment suppression explicitly rests on essentially atextual notions of policy or morality."). By its plain text, the Fourth Amendment only secures certain rights; it is not a font of remedies.

7

Nor does the Amendment's historical backdrop suggest otherwise. On the contrary, by the time of the Founding, "the common law" had long since "rejected the exclusionary rule." WILLIAM J. CUDDIHY, THE FOURTH AMENDMENT: ORIGINS AND ORIGINAL MEANING 1602–1791, at 431 (2009); *see also Bishop Atterbury's Case*, 16 How. St. Tr. 323, 640 (1723). And so did the new Republic. As Justice Story explained:

> The right of using evidence does not depend, nor, as far as I have any recollection, has ever been supposed to depend upon the lawfulness or unlawfulness of the mode, by which it is obtained. . . . In many instances, and especially on trials for crimes, evidence is often obtained from the possession of the offender by force or by contrivances, which one could not easily reconcile to a delicate sense of propriety, or support upon the foundations of municipal law. Yet I am not aware, that such evidence has upon that account ever been dismissed for incompetency.

*United States v. The La Jeune Eugenie*, 26 F. Cas. 832, 843–844 (C.C.D. Mass. 1822).

And "the logic of the exclusionary rule" would have made little sense to the Founders. *Collins v. Virginia*, 584 U.S. 586, 603 (2018) (THOMAS, J., concurring). First, the Founders cared only that evidence be "relevant and reliable." *Ibid.* But the exclusionary rule requires even the most probative evidence to be excluded. Second, the Founders did not conceive of "a wrongful act by an officer" as "a form of government illegality." Thomas Y. Davies, *Recovering the Original Fourth Amendment*, 98 MICH. L. REV. 547, 554 (1999). Instead, "when a government official exceeded his legal authority"—for example, by violating the Fourth Amendment—he acted only "as a private individual." Thomas Koenig & Christopher D. Moore, *Of State Remedies and Federal Rights*, 75 CATH. U. L. REV. (forthcoming) (manuscript at 10), https://perma.cc/2GUZ-ENE5. So the proper recourse

for an individual whose rights had been violated came "through tort suits or self-help." *Utah v. Strieff*, 579 U.S. 232, 237 (2016). I am aware of no Founding-era evidence that the government could not introduce probative evidence against a criminal wrongdoer simply because some private individual who happened to be an officer had committed a private wrong against that same defendant.

B

So where did the exclusionary rule come from, if not from the Founding?

Traces of the rule date to *Boyd v. United States*, 116 U.S. 616 (1886). *See* Potter Stewart, *The Road to* Mapp v. Ohio *and Beyond: The Origins, Development and Future of the Exclusionary Rule in Search-and-Seizure Cases*, 83 Colum. L. Rev. 1365, 1372 (1983). In *Boyd*, "[i]nvestigators" obtained a court "order requiring Boyd to provide the government with the invoice for items he had recently imported to determine if he had paid the required customs taxes on them." Orin S. Kerr, *The Curious History of Fourth Amendment Searches*, 2012 Sup. Ct. Rev. 67, 77. The Supreme Court held that that production order violated both the Fourth and Fifth Amendments.

*Boyd* was a surprising start to the exclusionary rule. Most fundamentally, it "injected exclusion into the picture" only because the case presented what the Court deemed a Fifth Amendment violation. Stewart, *supra*, at 1373. As the Court put it, subpoenaing the defendants' "private books and papers" was "compelling him to be a witness against himself" within the meaning of the Fifth Amendment. *Boyd*, 116 U.S. at 633. Since the introduction of compelled testimony *itself* violates the Fifth Amendment, the Court held that "admission" of the invoice "in evidence" was "erroneous and unconstitutional." *Id.* at 638.

Roughly 20 years later, in *Adams v. New York*, 192 U.S. 585 (1904), the Supreme Court "seemed to bury the exclusionary rule—even before its birth was recognized." Stewart, *supra*, at 1374. In that case, Albert Adams was convicted for gambling. To obtain the conviction, the prosecution had admitted into evidence private papers seized by police. Adams argued the seizure violated the Fourth Amendment. *Ibid.* And as relevant for our purposes here, he argued the "admission" of the papers "into evidence violated the [F]ifth . . . [A]mendment[.]" *Ibid.*

The Court disagreed. Echoing Justice Story nearly a century hence, the Court explained that the evidence was "clearly competent as tending to establish the guilt of the accused." *Adams*, 192 U.S. at 594. So the Government could introduce it. *Ibid.* The Court then distinguished *Boyd* on the ground that it simply barred the compulsory "*production*" of "private papers." *Id.* at 597 (emphasis added). In *Adams*, by contrast, the papers were not forcibly produced but freely introduced.

Just ten years later, the Court decided *Weeks v. United States*, 232 U.S. 383 (1914). And "it became clear that the *Adams* case was just a wild turn in the exclusionary rule roller coaster track." Stewart, *supra*, at 1374. *Weeks* involved a conviction for gambling. Officers entered Weeks's house "and carried away certain letters and envelopes found in the drawer of a chiffonier." 232 U.S. at 386. The Government introduced the letters into evidence, *see id.* at 388, and the jury found Weeks guilty. On appeal, Weeks argued that his "papers" had been "admitted into evidence" in violation of the Fourth Amendment, Stewart, *supra*, at 1374.

The Court excluded the evidence—but not because of the exclusionary rule. It held only that Weeks was entitled to get his papers back when he petitioned for their return "*before* trial." *Id.* at 1375. And under *Boyd*, once Weeks had the papers in his possession, the Government could not

No. 23-40652

"subpoena their production." *Ibid.* Thus, in *Weeks*, exclusion was just a byproduct of "the hypothetical unavailability of the evidence." *Ibid.*

So after *Weeks*, officers had an obvious workaround. They could just make copies before returning any papers. Thus, they would comply with *Weeks*'s holding that the defendant was entitled to their return. And they would avoid *Boyd*'s holding because they would not need to subpoena production of the papers. Then, in 1920, the Court closed that loophole: "The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all." *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 (1920).

Still, the development of the exclusionary rule was not complete.[1] That would not happen until 1961, almost two centuries after the Founding. Then, in *Mapp v. Ohio*, 367 U.S. 643 (1961), the Warren Court overruled *Wolf v. Colorado*, 338 U.S. 25 (1949), and held the exclusionary rule applicable in state court. The Court emphasized that "the criminal is to go free because the constable has blundered." *Id.* at 659 (quotation omitted). And with that, the exclusionary rule reached its zenith.

## C

Times have changed since *Mapp*. A lot.

These days, the Court recognizes the exclusionary rule as a relic of "the heady days in which [the Supreme] Court assumed" unfettered powers to create causes of action or remedies *ex nihilo*. *Egbert v. Boule*, 596 U.S. 482, 491 (2022) (citation omitted). As the Supreme Court has emphasized, the

---

[1] To tell the full story of the exclusionary rule, I would need to discuss many more cases. But I leave that to the law reviews. *See, e.g.*, Stewart, *supra*, at 1376 (discussing *Gouled v. United States*, 255 U.S. 298 (1921), and *Agnello v. United States*, 269 U.S. 20 (1925)).

exclusionary rule is a judicial invention "designed to safeguard Fourth Amendment rights." *United States v. Leon*, 468 U.S. 897, 906 (1984)(quotation omitted). Although that once led the exclusionary rule to be celebrated, *see Nardone v. United States*, 308 U.S. 338, 340 (1939), that is no longer the case. Today, the Supreme Court is cognizant that judges lack free-wheeling lawmaking powers. So it has cautioned courts to wield the exclusionary rule only in the "last resort." *Hudson*, 547 U.S. at 591.

And it has imposed sharp limits on the exclusionary rule. In general terms, the exclusionary rule now applies only "when the costs of exclusion outweigh its deterrent benefits." *Strieff*, 579 U.S. at 235. Because the costs are always grave, the deterrence benefits must be weighty. *Davis*, 564 U.S. at 237. And only certain deterrence benefits count in the calculus. Specifically, courts seek to deter only "*intentional*" police conduct that is "*patently* unconstitutional." *Herring v. United States*, 555 U.S. 135, 143 (2009) (emphasis added); *Arizona v. Evans*, 514 U.S. 1, 14–15 (1995). *But cf. Herring*, 555 U.S. at 144 (leaving open the possibility that the exclusionary rule might sometimes apply if only to deter "recurring or systemic" negligence).

In specific terms, the Supreme Court has held that if the causal connection between evidence and underlying illegality becomes "too attenuated," the evidence is no longer deemed poisoned by unconstitutionality and the "exclusionary rule does not apply." *Strieff*, 579 U.S. at 235, 237 (explaining the "so-called 'fruit of the poisonous tree' doctrine"). As it turns out, the causal connection is often too attenuated, *see id.* at 237–38 (enumerating "several exceptions" while emphasizing the narrowness of the exclusionary rule), even in cases when there is "a direct causal connection," *Hudson*, 547 U.S. at 593.

Even when evidence remains poisoned, it might still be admissible under the good faith exception. The good faith exception was first announced

No. 23-40652

in *Leon*. 468 U.S. at 925 . There, the Court held that evidence seized under a "defective" warrant was still admissible if the officers who executed the warrant had acted "objectively reasonabl[y]"—or in "good faith"—in "rel[ying]" on it. *Id.* at 908, 922. Since *Leon*, the good faith exception has expanded to encompass "objectively reasonable reliance on binding appellate precedent," *Davis*, 564 U.S. at 249–50, on subsequently invalidated statutes, *Illinois v. Krull*, 480 U.S. 340 (1987), and on erroneous information concerning arrest warrants, *Evans*, 514 U.S. at 4–6; *Herring*, 555 U.S. at 136–37.

*

Today, the exclusionary "rule" is in fact the exclusionary *exception*. That is, exclusion is now the exception to the ordinary rule that existed at the Founding and that Justice Story applied in *The La Jeune Eugenie*. And over the last 35 years, no criminal defendant has won a case before the Supreme Court about exclusion. *See* Orin Kerr, *The Court after Scalia: Scalia's Absence May Help Preserve the Exclusionary Rule*, SCOTUSBlog (Sept. 16, 2016), https://perma.cc/3S25-5ZDY. The exclusionary exception is itself subject to exceptions, like *Leon*'s good faith exception. And *Leon*'s good faith exception to the exclusionary exception is in turn subject to at least four other exceptions.[2] So if the point of *Mapp* is to deter blundering constables, *see* 367 U.S. at 659, query how that is even possible when the exception-laden doctrine is cumbersome to the point of unpredictability.

## II

With that background, I turn to this case. I explain what standard our circuit applies in cases like this where officers rely on a valid warrant that

---

[2] Only one of these four exceptions to the good faith exception is relevant. *See Leon*, 468 U.S. at 922–23. I discuss that exception below. *See infra*, at 14–18.

itself relied upon information unlawfully obtained. I also describe how I would refine that standard.

Here, no one doubts that the warrant itself was valid. Instead, the alleged problem is that Officer Bell sought the warrant based on information she unlawfully obtained.

That argument is governed by *United States v. Massi*, 761 F.3d 512 (5th Cir. 2014). In that case, a federal agent obtained a warrant to search an airplane based on information he obtained during an illegal arrest. *See id.* at 519, 524. That is, the warrant itself was valid, but the information the officer used to obtain the warrant was acquired illegally. The agent then executed the warrant and seized over 10 kilograms of marijuana. *Id.* at 519.

We held that the evidence was admissible under the good faith exception. *Id.* at 525, 532. In reaching that holding, we announced the following rule: Evidence is admissible if the officer's conduct that led to the relevant information was "'close enough to the line of validity' that *an objectively reasonable officer . . .* would believe that the information" gathered "was not tainted by unconstitutional conduct." *Id.* at 528 (emphasis added). For shorthand reference, we call this *Massi*'s "objectively reasonable officer" rule.

*Massi*'s "objectively reasonable officer" rule does not float in its own little pond, disconnected from the sea of exclusionary rule precedent. On the contrary, *Massi* situated its "objectively reasonable officer" rule within the familiar framework of *Leon*. *See id.* at 531. Specifically, *Massi* held that its rule fit within the first of *Leon*'s recognized exceptions to the good faith exception: the "misleading the magistrate" exception.[3] *Ibid.* (Apologies for

---

[3] As noted, *Leon*'s three other exceptions are not relevant here. *See supra*, at 13 n.2.

how cumbersome that is. But here's the *Massi* holding unpacked: Good faith is an exception to the exclusionary rule. So if one of *Leon*'s exceptions to the good faith exception applies, the exclusionary rule applies, and evidence should be suppressed. So if an officer misleads the magistrate under *Massi/Leon*, the evidence should be suppressed. The judge-made exclusionary rule, its exceptions, and its exceptions' exceptions are convoluted to be sure.)

So under *Massi*, if an "objectively reasonable officer" would believe he lawfully acquired the information in the affidavit, then the officer did not "mislead" the magistrate. That allows the officer to make mistakes in acquiring information and drafting affidavits—as long as they are not *so* bad that any objectively reasonable officer would have recognized them. If the magistrate then issues an affidavit, the reasonably errant officer can rely on the warrant in good faith. But if no "objectively reasonable officer" would believe he acquired the information constitutionally, then that officer misled the magistrate. And if the magistrate issues a warrant based on the information supplied by the objectively unreasonable officer, that officer cannot then rely on the warrant in good faith.

What is the line for objective reasonableness and hence good faith under *Massi* and *Leon*? Under our cases, it's anyone's guess. All we know is that the officer's conduct must be "close enough to the line of validity" that it would be reasonable for an officer to rely on it. *Id.* at 528. But how can we know whether an officer's conduct is on the wrong side of the line? How specific must the parties be when articulating the constitutional "line of validity" the officer must not cross? Does the absence of a factually similar case mean that the officer's conduct is automatically over the line? Our

court's members disagree. *See, e.g.*, *United States v. Holley*, 831 F.3d 322, 326–27, 331–32 (5th Cir. 2016) (debating how to apply the test).

So, in practice, *Massi*'s "close enough" standard is nothing more than an "I know it when I see it" test. That's a huge problem. The current objective reasonableness standard gives officers zero ability to know in advance if their conduct will lead to exclusion. It makes little sense to graft such a freewheeling standard onto the good faith exception, especially when we are only supposed to use the exclusionary exception to deter "*intentional*" police conduct that is "*patently* unconstitutional." *Herring*, 555 U.S. at 143 (emphasis added).

In my view, there's a clearer way to draw the line. The "same standard of objective reasonableness that . . . defines the qualified immunity accorded an officer" should define *Massi*'s "objectively reasonable officer" rule. *Messerschmidt v. Millender*, 565 U.S. 535, 546 n.1 (2012) (quoting *Malley v. Briggs*, 475 U.S. 335, 344 (1986)). That might sound surprising, so let me explain. *Leon* held that its "good-faith exception[] turn[s] . . . on objective reasonableness." 468 U.S. at 924. And "the same standard of objective reasonableness" "defines" both "the qualified immunity accorded an officer" and *Leon*'s good faith exception. *Messerschmidt*, 565 U.S. at 546 n.1 (quotations omitted). And of course, as we just noted, *Massi*'s "objectively reasonable officer" rule is part of *Leon*'s good faith exception. So "the same standard of objective reasonableness that . . . defines the qualified immunity accorded an officer" defines *Massi*'s "objectively reasonable officer" rule. *Ibid.* (quotation omitted).

In other words, the logic works like this:

P1: (*A*) Objective reasonableness for purposes of qualified immunity = (*B*) objective reasonableness for purposes of *Leon*. *See ibid.*

P2: (*B*) Objective reasonableness for purposes of *Leon* = (*C*) objective reasonableness for purposes of *Massi*. *See supra*, at 14–16; *see also Massi*, 761 F.3d at 528 (invoking the concept of the "objectively reasonable officer" familiar from both *Leon* and qualified immunity).

∴ (*A*) Objective reasonableness for purposes of qualified immunity = (*C*) objective reasonableness for purposes of *Massi*.

The upshot? We may borrow the "objective reasonableness" framework from our qualified immunity cases to decide if the officer's conduct was "close enough to the line of validity" under *Massi*. If the officer's conduct was close enough to that line, the officer was wrong but not objectively unreasonably wrong. That means the *Massi/Leon* good faith exception to the exclusionary rule applies.

How would this proposal work in practice? Leonard would bear the burden of showing that an *objectively reasonable officer* in the officers' shoes would have known he was violating the Fourth Amendment when he entered Leonard's home. He must do so by citing "legal principle[s]" that have a "sufficiently clear foundation in then-existing precedent." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018). As in our qualified immunity cases, he cannot define those principles "at a high level of generality." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (quotation omitted). Instead, Leonard must point to factually similar cases that "clearly prohibit the officer[s'] conduct in the *particular circumstances before [them]*." *Wesby*, 583 U.S. at 63 (emphasis added). If he can't identify any factually similar case clearly establishing the law, Leonard must argue that his case involves such

utterly "egregious facts" that there could be no "doubt about the obviousness" of the violation. *Taylor v. Riojas*, 592 U.S. 7, 9 & n.2 (2020) (per curiam).

Using qualified immunity doctrine's "objective-reasonableness standard" in cases like this one not only clarifies the *Massi* rule, but also prevents us from reaching odd results. As it stands today, we analyze an officer's "objective reasonableness" under the Fourth Amendment differently depending on the type of proceeding in which the injured party raises the allegation. I would rather take the Supreme Court at its word and hold that the "same standard of objective reasonableness" applies in both contexts. *Messerschmidt*, 565 U.S. at 546 n.1 (quotation omitted).

One might worry that using modern qualified immunity doctrine's "objective-reasonableness standard" in cases like this one places a high burden on defendants seeking to suppress evidence. But that is a virtue, not a vice. Reading *Massi* to avoid an undisciplined, "I know it when I see it" standard upholds the Supreme Court's command to suppress evidence only as a "last resort." *Hudson*, 547 U.S. at 591.

\*    \*    \*

"Close" only counts in horseshoes and hand grenades—not in evidentiary suppression hearings. I would require criminal defendants to show that the officer who illegally discovered the information used to obtain a warrant violated clearly established law. Otherwise, the good faith exception applies and officers may rely on the warrant.