[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-13694
Non-Argument Calendar
_____

D.C. Docket No. 3:13-cv-00069-DHB-BKE

SHERRILYN TAYLOR,

Plaintiff - Appellant,

versus

RICHARD TAYLOR,
in his individual capacity,
CLARENCE SANDERS,
in his individual capacity,

Defendants - Appellees,

LYNDA WAMMOCK,

Defendant.
_____

Appeal from the United States District Court
for the Southern District of Georgia
_____

(May 3, 2016)

Before JORDAN, ROSENBAUM, and JULIE CARNES, Circuit Judges.

PER CURIAM:

In this case, Plaintiff-Appellant Sherrilyn Taylor ("Ms. Taylor") alleges that Defendant-Appellee Richard Taylor ("Deputy Taylor"), formerly a Deputy with the Montgomery County Sheriff's Department in Montgomery County, Georgia, arrested her without probable cause, used excessive force during the arrest, and then violated her due-process rights by failing to take her promptly before a judge. Ms. Taylor also alleges that the Sheriff, Defendant-Appellee Clarence Sanders ("Sheriff Sanders") engaged in some of this wrongdoing or is responsible as a supervisor, and that Defendant Lynda Wammock ("Wammock") is liable for initiating the baseless prosecution against Ms. Taylor. The district court granted summary judgment in favor of Deputy Taylor and Sheriff Sanders and dismissed Ms. Taylor's claims against Wammock. Ms. Taylor now brings this appeal, contending that the district court got it all wrong. After careful review, we affirm.

## I.  Standard of Review

We review *de novo* a district court's grant of summary judgment, applying the same legal standards that governed the district court. *Bradley v. Franklin Collection Serv., Inc.*, 739 F.3d 606, 608 (11th Cir. 2014). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We

2

consider the record and draw all reasonable inferences in the light most favorable to Ms. Taylor, the non-moving party. *See Bradley*, 739 F.3d at 608.

## II.  Factual Background

This case centers on Deputy Taylor's investigation and arrest of Ms. Taylor for allegedly making harassing and threatening phone calls to Wammock, a long-term acquaintance. We present the facts regarding Wammock's two complaints to the Sheriff's Department, the circumstances of Ms. Taylor's arrest, and the events following her arrest.

### A.    *Wammock's Complaints*

On September 18, 2011, Wammock complained to the Sheriff's Department that Ms. Taylor had been "calling her from a restricted number several times a day cussing her out and threatening her." When Deputy Taylor went to Wammock's home to investigate the complaint, Wammock identified Ms. Taylor as the caller. Wammock claimed that she recognized Ms. Taylor's voice because they had known each other for twenty years. Deputy Taylor observed that there were numerous calls from a restricted number on Wammock's caller identification. Deputy Taylor then spoke with Ms. Taylor at her home about the allegations, stating that he wanted "the truth" and "he knows how Lynda Wammock is." Ms. Taylor denied making the calls and offered her phone to Deputy Taylor for

3

inspection. Deputy Taylor did not look at Ms. Taylor's phone, and he left without making an arrest.

Three days later, on September 21, 2011, Wammock contacted the Sheriff's Department again to report that she had continued to receive harassing phone calls from Ms. Taylor.[1] Specifically, Wammock claimed that Ms. Taylor threatened to burn her house down in one of the calls. After taking Wammock's complaint, Deputy Taylor went to Wammock's residence and again confirmed that she had received calls from a restricted number on her caller identification. Thereafter, Deputy Taylor informed Sheriff Sanders of Wammock's allegations and his intent to obtain a warrant for Ms. Taylor's arrest. Sheriff Sanders permitted Deputy Taylor to seek a warrant. Deputy Taylor testified before a judge, who issued warrants to arrest Ms. Taylor for making harassing phone calls and terroristic threats.[2]

---

[1] There is conflicting testimony about whether Wammock went to the Sheriff's Office to make a complaint or whether she simply called to complain. This fact is not material, however, since it is undisputed that Wammock made the second complaint in some way.

[2] Deputy Taylor testified that he went to Ms. Taylor's home a second time *before* obtaining the arrest warrants, but Ms. Taylor argues that her daughter was home and would have answered had Deputy Taylor in fact stopped by. For purposes of reviewing the grant of summary judgment, we credit Ms. Taylor's version of events on this point. See *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1247 (11th Cir. 2013) (factual disputes are resolved in favor of the non-moving party).

*B.*    *Ms. Taylor's Arrest*

After obtaining the arrest warrants, Deputy Taylor and a state trooper went to Ms. Taylor's home that same day, September 21.  Ms. Taylor was not there, but, when told of the Deputy's visit by her daughter, she called the Sheriff's Department and arranged to meet Deputy Taylor at a local convenience store called T-Byrds later that afternoon.

Ms. Taylor arrived at T-Byrds in a car with three other people.  A state trooper was there when Ms. Taylor arrived, and Deputy Taylor arrived soon after.  According to Deputy Taylor, he asked Deputy David Williamson to accompany him because of Ms. Taylor's propensity to fight.

In the parking lot of T-Byrds, Ms. Taylor exited her car to meet Deputy Taylor as he walked over.[3]  Deputy Taylor mentioned something of Wammock's most recent allegation.[4]  Ms. Taylor repeatedly denied making any phone calls to Wammock.  Ms. Taylor again offered her phone to Deputy Taylor, who refused to

---

[3] A small part of the following interaction is captured on a dash-camera video from the state trooper's patrol car, which was parked at T-Byrds.  Deputy Taylor can be seen walking by the patrol car (from the right to the left of the video frame) toward Ms. Taylor.  However, the video does not otherwise show the encounter between Ms. Taylor and Deputy Taylor, who were standing to the left of the patrol car and outside of the video frame.  The dash camera did capture audio from the encounter, though, which we use to supplement our construction of the events based on the testimony of Deputy Taylor and Ms. Taylor.

[4] The dash-camera audio contradicts Ms. Taylor's testimony that Deputy Taylor *immediately* began yelling and cussing at her upon arriving at T-Byrds.  We therefore do not accept Ms. Taylor's testimony on this specific point.  *See Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776 (2007).  Nonetheless, the audio is clear that Deputy Taylor did yell and cuss at Ms. Taylor during the encounter.

look at it.   Then, according to Deputy Taylor, he told Ms. Taylor that he had warrants for her arrest and that she "know[s] what we've got do."  Although Ms. Taylor denies that Deputy Taylor ever mentioned arrest warrants, Ms. Taylor's subsequent statement, "it ain't right that you gonna lock me up for something I ain't done now," makes it clear that she understood that Deputy Taylor was there to arrest her.

Things escalated quickly from that point.  Deputy Taylor raised his voice and told Ms. Taylor, "You better get in the back of that goddamn car right now." Ms. Taylor interjected, pleading that she had not done anything wrong.  Deputy Taylor talked over her, yelling at this point, swearing that he had had "enough."

Deputy Taylor then grabbed Ms. Taylor, slammed her into the side of the patrol car, and handcuffed her.  Deputy Taylor was around 6'1" tall, weighed approximately 280 pounds, and had the nickname "Truck."  Ms. Taylor claims that she was not resisting in any way when Deputy Taylor, without warning, grabbed her and slammed her head face first into the trooper's patrol car several feet away. According to Deputy Taylor, he grabbed her by the upper half of her arms, spun her body so that she was facing the patrol car, and pushed her against the side of the car so he could handcuff her.  Deputy Taylor claims that Ms. Taylor took steps backward immediately before he subdued her.  Deputy Taylor handcuffed Ms. Taylor while she was pushed against the patrol car.

6

As a result of the arrest, Ms. Taylor suffered a spiral fracture in her right hand, multiple contusions to her right hand, forearm, and right upper eyelid, and a chest wall contusion.

## C.    Ms. Taylor's Detention and Eventual Release

After her arrest on September 21, Ms. Taylor was first taken to the Sheriff's Office for booking and then to the Irwin County Detention Center in Ocilla, Georgia.  Montgomery County did not have its own jail and had contracted with Irwin County for the provision of jail services.

At the time of her arrest, Ms. Taylor was on parole for a prior felony conviction.  Because her arrest violated the conditions of her parole, the State Board of Pardons and Parole ("Parole Board") issued a Warrant and Order for Arrest, which states, "As a parole violator this subject is not bondable under any circumstances."  On the day of her arrest, a parole officer contacted Sheriff Sanders and informed him that a "parole hold" had been placed on Ms. Taylor.  Sheriff Sanders claimed that, due to the parole hold, he waited for the Superior Court of Montgomery County to set bond in Ms. Taylor's case rather than promptly presenting her before a judge.

On September 30, 2011, a superior court judge in Montgomery County set a $15,000 property bond for Ms. Taylor.  She bonded out of jail on October 12,

2011, three weeks after her arrest. On February 6, 2012, the district attorney presented Ms. Taylor's case to a grand jury, which declined to indict.

### III. Procedural History

Ms. Taylor filed her initial civil-rights complaint under 42 U.S.C. § 1983 in September 2013 in the United States District Court for the Southern District of Georgia. She later filed the operative amended complaint naming Deputy Taylor, Sheriff Sanders, and Wammock as defendants. In broad terms, Ms. Taylor alleged that her arrest was not supported by probable cause, that Deputy Taylor used excessive force in arresting her, and that her due-process rights were violated when she was not brought before a judge within 72 hours of her arrest.

In her amended complaint, Ms. Taylor pled the following claims: (1) § 1983 malicious prosecution against all defendants; (2) § 1983 excessive force against Deputy Taylor; (3) § 1983 denial of due process against Deputy Taylor; (4) § 1983 supervisory liability against Sheriff Sanders; (5) state-law false arrest/malicious prosecution against all defendants; (6) state-law assault and battery against Deputy Taylor.

The district court granted summary judgment to Deputy Taylor and Sheriff Sanders and dismissed the claims against Wammock. The court found that Ms. Taylor's § 1983 claims failed because arguable probable cause supported Ms. Taylor's arrest; Deputy Taylor did not use excessive force during the arrest; Ms.

Taylor received due process in light of her status as a parolee; and Sheriff Sanders was not liable because Ms. Taylor had not shown that her constitutional rights were violated. The court also found that Ms. Taylor's state-law claims failed because she presented no evidence that Deputy Taylor or Sheriff Sanders acted with actual malice in obtaining the arrest warrants or in using force to arrest her. Finally, the court dismissed Ms. Taylor's state-law claim against Wammock because there was no evidence that Wammock directly or indirectly urged Ms. Taylor's arrest.[5] Ms. Taylor now appeals.

## IV.  Discussion

### A.    Federal § 1983 Claims against Deputy Taylor and Sheriff Sanders

#### 1.    Qualified Immunity Principles

The defense of qualified immunity aims to strike a balance between "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 815 (2009). To that end, qualified immunity protects government officials engaged in discretionary functions and sued in their individual capacities unless they violate "clearly established federal statutory or constitutional rights of

---

[5] The district court properly concluded that Wammock was not subject to suit under § 1983 because she was not acting under color of state law. *See Harvey v. Harvey*, 949 F.2d 1127, 1130 (11th Cir. 1992).

9

which a reasonable person would have known." *Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir.2013) (brackets and internal quotation marks omitted).

Under the qualified-immunity doctrine, the official must first show that he was engaged in a discretionary function. *Maddox v. Stephens*, 727 F.3d 1109, 1120 (11th Cir. 2013). It is undisputed that Deputy Taylor and Sheriff Sanders have established this fact.

The burden then shifts to Ms. Taylor to show that the defendants are not entitled to qualified immunity. *See id.* To do so, Ms. Taylor must show both that the defendants violated a constitutional right and that the right was "clearly established . . . in light of the specific context of the case, not as a broad general proposition[,]" at the time of the alleged violation. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 (2001). We may decide these issues in either order, but Ms. Taylor must make both showings to survive a qualified-immunity defense. *Maddox*, 727 F.3d at 1120-21.

The requirement that the right be clearly established is to ensure that "officers are on notice their conduct is unlawful." *Saucier*, 533 U.S. at 206, 121 S. Ct. at 2158. In other words, the right's "contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S. Ct. 2508, 2515 (2002) (internal quotation marks omitted). We have recognized three ways in which a plaintiff can

demonstrate that the asserted right was clearly established: (1) identifying a case with a materially similar factual scenario; (2) pointing to a broader, clearly established principle that applies with "obvious clarity" to a novel factual situation; (3) arguing that the conduct at issue so obviously violated the Constitution that existing case law is unnecessary. *Loftus v. Clark-Moore*, 690 F.3d 1200, 1204-05 (11th Cir. 2012). In any of the three situations, the unlawfulness of the officer's conduct must be readily apparent. *See id.*

### 2. Malicious Prosecution against Deputy Taylor

This Circuit recognizes a § 1983 claim for malicious prosecution in violation of the Fourth Amendment. *Wood v. Kesler*, 323 F.3d 872, 881 (11th Cir. 2003). "To establish a § 1983 malicious prosecution claim, the plaintiff must prove two things: (1) the elements of the common law tort of malicious prosecution; and (2) a violation of [her] Fourth Amendment right to be free from unreasonable seizures."[6] *Grider v. City of Auburn, Ala.*, 618 F.3d 1240, 1256 (11th Cir. 2010). An arrest without probable cause is an unreasonable seizure that violates the Fourth Amendment. *Id.* By the same token, "the existence of probable cause defeats a § 1983 malicious prosecution claim." *Id.*

---

[6] The common-law elements of malicious prosecution include the following: "(1) a criminal prosecution instituted or continued by the present defendant; (2) with malice and without probable cause; (3) that terminated in the plaintiff accused's favor; and (4) caused damage to the plaintiff accused." *Wood*, 323 F.3d at 882.

11

Probable cause exists when the facts and circumstances, of which the officer has reasonably trustworthy information, would cause a prudent person to believe that the suspect has committed, is committing, or is about to commit an offense. *Jordan v. Mosley*, 487 F.3d 1350, 1355 (11th Cir. 2007). "No officer has a duty to prove every element of a crime before making an arrest. Police officers are not expected to be lawyers or prosecutors." *Id.* (citation and internal quotation marks omitted). Furthermore, while an arresting officer must conduct "a reasonable investigation to establish probable cause," "[a]n officer . . . need not take every conceivable step . . . at whatever cost[] to eliminate the possibility of convicting an innocent person." *Rankin v. Evans*, 133 F.3d 1425, 1435-36 (11th Cir. 1998) (internal quotation marks omitted).

The defense of qualified immunity applies even if the arresting officer had only "arguable" probable cause, which "exists where reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest." *Grider*, 618 F.3d at 1257 (internal quotation marks omitted). In other words, qualified immunity still applies if the officer reasonably but mistakenly believed that probable cause was present. *Id.* The standard is an objective one and does not depend on the subjective beliefs or intent of the arresting officer. *Id.*

12

Deputy Taylor obtained warrants to arrest Ms. Taylor for making harassing phone calls, in violation of O.C.G.A. § 16–11–39.1(a), and for making terroristic threats, in violation of O.C.G.A. § 16–11–37(a).   Under O.C.G.A. § 16–11–39.1(a)(1), "A person commits the offense of harassing communications if such person . . . [c]ontacts another person repeatedly via telecommunication, e-mail, text messaging, or any other form of electronic communication for the purpose of harassing, molesting, threatening, or intimidating such person or the family of such person."   Under O.C.G.A. § 16–11–37(a), "A person commits the offense of a terroristic threat when he or she threatens to . . . burn or damage property with the purpose of terrorizing another . . . or in reckless disregard of the risk of causing such terror . . . ."   The terroristic-threats statute further provides that "[n]o person shall be convicted under this subsection on the uncorroborated testimony of the party to whom the threat is communicated."  O.C.G.A. § 16–11–37(a).

The fact that Deputy Taylor obtained warrants from a neutral magistrate is significant.  When considering the question of qualified immunity "[w]here the alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner." *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1245 (2012).  A warrant issued by a neutral magistrate confers a "shield of immunity" on the officer. *Id.*

13

The shield of immunity conferred by an arrest warrant can be lost, but only when "it is obvious that no reasonably competent officer would have concluded that a warrant should issue." *Id.* (quotation marks omitted). The threshold for establishing this "narrow" exception to immunity is a high one. *See Malley v. Briggs*, 475 U.S. 335, 346 n.9, 106 S. Ct. 1092, 1098 n.9 (1986) ("It is a sound presumption that the magistrate is more qualified than the police officer to make a probable cause determination, and it goes without saying that where a magistrate acts mistakenly in issuing a warrant but within the range of professional competence of a magistrate, the officer who requested the warrant cannot be held liable." (citation and internal quotation marks omitted)).

Here, Ms. Taylor has not shown that it was "entirely unreasonable" for Deputy Taylor to believe, in the particular circumstances of this case, that he had probable cause to arrest Ms. Taylor for making harassing phone calls and terroristic threats. *See Messerschmidt*, 132 S. Ct. at 1246. When Deputy Taylor applied for the arrest warrants, he had been given an account of the alleged harassing and threatening phone calls from Wammock, the purported victim-witness, which included some details of the statements. "Generally, an officer is entitled to rely on a victim's criminal complaint as support for probable cause." *Rankin*, 133 F.3d at 1441. Wammock also identified Ms. Taylor as the caller in both of her complaints, and it would not have been unreasonable for Deputy Taylor

14

to have credited Wammock's ability to identify Ms. Taylor's voice, given that they had known each other for twenty years.

Moreover, Deputy Taylor had corroborated Wammock's claims to a limited extent when he went to her home and observed that she had numerous telephone calls from a restricted number on her caller identification.  And Ms. Taylor does not contend that the alleged phone calls, assuming they were made and without regard to the identity of the caller, do not arguably establish the elements of both statutes: (1) repeated communications for the purpose of harassment, *see* O.C.G.A. § 16–11–39.1(a); and (2) a "threat[] to . . . burn or damage" Wammock's house with the intention of terrorizing her, *see id.* § 16–11–37(a).

Ms. Taylor primarily argues that Wammock was not a reliable witness and that she did not provide reasonably trustworthy information.  However, Ms. Taylor has pointed to no information known to Deputy Taylor, or reasonably available to him, that would have indicated to him that Wammock was unreliable and untrustworthy.[7]  *See Jordan*, 487 F.3d at 1355; *cf. Dahl v. Holley*, 312 F.3d 1228, 1234 (11th Cir. 2002) ("[A]rresting officers . . . are not required to sift through conflicting evidence or resolve issues of credibility, so long as the totality of the circumstances present a sufficient basis for believing that an offense has been

---

[7] Whatever personal knowledge Sheriff Sanders had of Wammock cannot simply be imputed to Deputy Taylor.  Moreover, the fact that Wammock had sold drugs in the past or liked to fight has no clear bearing on whether she was truthful with Deputy Taylor.

15

committed."). To the contrary, Deputy Taylor's statement to Ms. Taylor that "he knows how Lynda Wammock is" and wanted the truth from Ms. Taylor could be viewed as an indication that Deputy Taylor understood that Wammock could have a difficult personality that might explain why Ms. Taylor would have called her up and harassed her. And even if Deputy Taylor had looked at Ms. Taylor's phone when she offered it, the most he could have discovered was that she did not use that particular phone to make the calls, not that she did not make the calls at all.

Ms. Taylor also contends that Wammock's "bald" accusations, without corroboration, are insufficient to satisfy the standard of probable cause. The terroristic-threats statute provides, "No person shall be convicted under this subsection on the uncorroborated testimony of the party to whom the threat is communicated." O.C.G.A. § 16–11–37(a). This provision, however, does not alter the elements of the offense. *See Hall v. State*, 664 S.E.2d 882, 885-86 (Ga. Ct. App. 2008) (stating that, under O.C.G.A. § 16–11–37, the state is required to prove two elements only: "(1) that [the defendant] made the alleged threat and (2) that he did so with the purpose of terrorizing [the victim]"). Rather, it is an evidentiary requirement. *See id.* at 886 (noting that corroborating evidence may be "slight" and "can consist of the victim's demeanor after the threat is communicated"). And even assuming that uncorroborated testimony was all Deputy Taylor had which was ultimately found to be insufficient to convict under Georgia law, probable

16

cause does not require specific evidence that would be sufficient to sustain a conviction. *Dahl*, 312 F.3d at 1234.

While the grand jury ultimately did not return an indictment charging Ms. Taylor, which suggests that the evidence against her was weak and that perhaps Deputy Taylor should have done more to investigate, we also cannot say it is "obvious that no reasonably competent officer would have concluded that a warrant should issue." *See Messerschmidt*, 132 S. Ct. at 1245. Based on the totality of the circumstances, it was not "entirely unreasonable" for Deputy Taylor to conclude that Ms. Taylor had committed the offenses of making harassing phone calls and a terroristic threat. Even if the magistrate mistakenly issued the warrants, the facts do not support a conclusion that such a mistake rose to the level of "gross incompetence" or "neglect of duty" on Deputy Taylor's part. *See Malley*, 475 U.S. at 346 n.9, 106 S. Ct. at 1098 n.9. Accordingly, Deputy Taylor is entitled to qualified immunity on Ms. Taylor's § 1983 malicious-prosecution claim.

3.    Excessive Force against Deputy Taylor

The Fourth Amendment's guarantee against unreasonable searches and seizures "encompasses the plain right to be free from the use of excessive force in the course of an arrest." *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002). Whether a particular use of force is reasonable is an objective inquiry based on the facts and circumstances confronting the officer, rather than the "20/20 vision of

hindsight." *Graham v. Connor*, 490 U.S. 386, 396-97, 109 S. Ct. 1865, 1872 (1989); *see Saunders v. Duke*, 766 F.3d 1262, 1267 (11th Cir. 2014). We must make "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97, 109 S. Ct. at 1872.

Generally, we consider three factors in this objective inquiry: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the officer or others; and (3) whether the suspect is resisting arrest or attempting to flee. *See Lee*, 284 F.3d at 1198 (citing *Graham*, 490 U.S. at 396, 88 S. Ct. at 1872). The officer's subjective intentions are irrelevant to the inquiry under the Fourth Amendment. *Graham*, 490 U.S. at 397, 109 S. Ct. at 1872. The central question is whether the use of force is reasonably proportionate to the need for that force. *Lee*, 284 F.3d at 1198.

This Circuit has recognized "that some use of force by a police officer when making a custodial arrest is necessary and altogether lawful, regardless of the severity of the alleged offense." *Durruthy v. Pastor*, 351 F.3d 1080, 1094 (11th Cir. 2003); *see Lee*, 284 F.3d at 1197 (noting that Fourth Amendment jurisprudence has long recognized that the right to make an arrest carries with it the right to use some degree of force to effect it). We have occasionally described

such a threshold level of force as *de minimis*, which is insufficient to support a claim for excessive force. *Myers v. Bowman*, 713 F.3d 1319, 1328 (11th Cir. 2013); *see Nolin v. Isbell*, 207 F.3d 1253, 1257 (11th Cir. 2000) ("[W]e conclude this Circuit has established the principle that the application of de minimis force, without more, will not support a claim for excessive force in violation of the Fourth Amendment."). And we have stated that *de minimis* force, even when it is "unnecessary," is "not unlawful." *Durruty*, 351 F.3d at 1094.

The facts of this case are quite similar to those in *Nolin*. In *Nolin*, the officer, during the course of a lawful arrest, "grabbed [the plaintiff] from behind by the shoulder and wrist, threw him against a van three or four feet away, kneed him in the back and pushed his head into the side of the van, searched his groin area in an uncomfortable manner, and handcuffed him." *Nolin*, 207 F.3d at 1255. The plaintiff suffered bruising to his forehead, chest, and wrists. *Id.* We held that the "minimal amount of force and injury" shown by the facts was insufficient to overcome qualified immunity in an excessive force case. *Id.* at 1258; *see also Jones v. City of Dothan*, 121 F.3d 1456, 1460 (11th Cir.1997) (finding the force used to be minor where officers slammed the plaintiff against a wall, kicked his legs apart, required him to put his arms above his head, and pulled his wallet from his pants pocket).

Here, taking the facts in the light most favorable to Ms. Taylor, Deputy Taylor, during the course of a permissible arrest, grabbed Ms. Taylor without warning, slammed her against a patrol car several feet away, causing her head to hit the car first, and then handcuffed her. Ms. Taylor suffered a spiral fracture in her hand and bruising to her hand, forearm, right upper eyelid, and chest. Although the injury Ms. Taylor suffered was more severe than the injury in *Nolin*, the amount and type of force used in both cases is similar. Significantly, Ms. Taylor has not responded to Deputy Taylor's assertion that *Nolin* is on point. And we see nothing in the record to distinguish *Nolin*. Accordingly, we are constrained to conclude that, under our precedent, the force used to subdue and arrest Ms. Taylor was not excessive. *See Nolin*, 207 F.3d at 1255.

Nor does Ms. Taylor contend that Deputy Taylor used any force *after* she was restrained, when even *de minimis* force will support a claim for excessive force. *See Saunders*, 766 F.3d at 1279-80 ("[The *de minimis* principle] has never been used to immunize officers who use excessive and gratuitous force after a suspect has been subdued, is not resisting, and poses no threat."). Accordingly, the facts of this case are not comparable to *Lee*, for example, where the officer led the plaintiff "to the back of her car and slammed her head against the trunk *after* she was arrested and secured in handcuffs." *See Lee*, 284 F.3d at 1198-1200 (distinguishing *Nolin* and *Jones* on the basis that they did not involve "the

20

infliction of such severe and disproportionate force after the arrest had been fully effected, the arrestee completely secured, and all danger vitiated").

While we have concerns about the necessity of the force used in this instance and the general way in which Deputy Taylor handled the encounter with Ms. Taylor, this case is controlled by our binding precedent—precedent that required the district court to find that Deputy Taylor enjoyed qualified immunity for the force he employed in arresting Ms. Taylor.

Finally, even if we were to conclude that Deputy Taylor used objectively unreasonable, and more than *de minimis*, force against Ms. Taylor, she still bears the burden of overcoming the defense of qualified immunity by showing that Deputy Taylor had adequate notice that his conduct was unlawful. *See Saucier*, 533 U.S. at 206, 121 S. Ct. at 2158. We are unable to conclude that she has. Ms. Taylor has not identified a case with a materially similar factual scenario that supports her position. *See Loftus*, 690 F.3d at 1204. Indeed, *Nolin* is the case with the most similar facts that we have found, and it is plainly unfavorable to her. Given the similarity of *Nolin*, Ms. Taylor also cannot show that a broader, clearly established principle applies with "obvious clarity" to the particular factual situation faced by Deputy Taylor, or that the conduct at issue so obviously violated the Constitution that existing case law is unnecessary. *See id.* at 1204-05. As a

21

result, Ms. Taylor has not shown that Deputy Taylor violated a clearly established right.[8]

For these reasons, we conclude that Deputy Taylor is entitled to qualified immunity on Ms. Taylor's excessive-force claim.

4.    Supervisory Liability against Sheriff Sanders

Ms. Taylor contends that Sheriff Sanders is liable as a supervisor for Deputy Taylor's false arrest and malicious prosecution.  Supervisors cannot be held liable under § 1983 on the basis of vicarious liability.  *Keating*, 598 F.3d at 762.  Rather, to be liable under § 1983, the supervisor must have personally participated in the alleged constitutional violation or have a "causal connection" with it.  *Id.*  A causal connection may be established by showing that the supervisor directed a subordinate to act unlawfully or knowingly failed to prevent a subordinate from acting unlawfully.  *Id.*  For a supervisor to be liable, there must be an underlying "constitutional or statutory violation."  *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1308 (11th Cir. 2009).

Here, Ms. Taylor presented no evidence that Sheriff Sanders personally was involved in her arrest or that he directed Deputy Taylor to act unlawfully or knew that he would act unlawfully.  *See Keating*, 598 F.3d at 762.  The evidence reflects

_____

[8] Although the district court did not address this issue, it was part of Ms. Taylor's burden before the district court, and we may affirm the judgment on any adequate ground supported by the record.  *Feliciano*, 707 F.3d at 1251-52.

22

that Sheriff Sanders was aware of Deputy Taylor's intent to obtain an arrest warrant and did not prevent him from doing so, but as explained above, Ms. Taylor's arrest was supported by actual or arguable probable cause. Accordingly, there is no underlying constitutional violation that could subject Sheriff Sanders to supervisory liability under § 1983. *See Mann*, 588 F.3d at 1308.

In short, the district court properly found that Sheriff Sanders was not liable as a supervisor for Deputy Taylor's alleged false arrest.

> 4.    Due-Process Claim against Deputy Taylor and Sheriff Sanders

Ms. Taylor also argues that Deputy Taylor and Sheriff Sanders violated her clearly established due-process rights when they failed to present her to a judge immediately after her arrest.

Ms. Taylor contends that this clearly established federal right derives from Rule 5 of the Federal Rules of Criminal Procedure. Rule 5 states, in relevant part, "A person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge, or before a state or local judicial officer as Rule 5(c) provides, unless a statute provides otherwise." Fed. R. Crim. P. 5(a)(1)(A). However, "the federal rule requiring an arrested person to be taken without unnecessary delay before a committing magistrate has no application to one arrested on a state charge and in the custody of state officers." *Peters v.*

*Rutledge*, 397 F.2d 731, 735 (5th Cir. 1968).[9]  Here, Ms. Taylor was arrested on state charges and in the custody of state officers, so Rule 5 did not apply to her.

In the district court, Ms. Taylor also relied on O.C.G.A. § 17–4–26, which, like Rule 5, requires an arresting officer to take an arrestee before a committing judicial officer within 72 hours after arrest.  She no longer relies on this provision, but we note that our predecessor court, by which we are bound, has "held that even though [Georgia state law] required that an officer arresting under a warrant bring the person arrested before a committing officer within 72 hours after arrest, failure to take an arrestee before a magistrate is not a federal constitutional issue." *Stephenson v. Gaskins*, 539 F.2d 1066, 1068 n.* (5th Cir. 1976).

Overall, Ms. Taylor has not shown that her due-process rights were violated or that those rights were clearly established.  Accordingly, summary judgment was appropriately granted on this claim.

## B.    *State-Law Claims against Deputy Taylor and Sheriff Sanders*

### 1.    Official Immunity under Georgia Law

Georgia law provides state officers and employees with "official immunity," which means that they are generally "immune from individual liability for discretionary acts undertaken in the course of their duties and performed without wilfulness, malice, or corruption." *Reed v. DeKalb Cty.*, 589 S.E.2d 584, 587 (Ga.

---

[9] This Court adopted as binding precedent all Fifth Circuit decisions prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*).

24

Ct. App. 2003). An arresting officer is not liable unless he "act[ed] with actual malice or with actual intent to cause injury in the performance of [his] official functions." Ga. Const. Art. 1, § 2, ¶ IX(d); *Reed*, 589 S.E.2d at 588. "Actual malice" means "a deliberate intention to do wrong." *Merrow v. Hawkins*, 467 S.E.2d 336, 337 (Ga. 1996).

### 2. False Arrest/Malicious Prosecution

There is no evidence that Deputy Taylor or Sheriff Sanders acted with actual malice or intent to injure in obtaining arrest warrants. Ms. Taylor does not allege, and there is no evidence to show, that Deputy Taylor and Sheriff Sanders were motivated by a "personal animus" toward her or that they "manufactur[ed] evidence or knowingly present[ed] perjured testimony" to obtain the arrest warrants.[10] *See Marshall v. Browning*, 712 S.E.2d 71, 74 (Ga. Ct. App. 2011) (stating that these factors would support a finding of actual malice). While the evidence against her may have been weak and largely uncorroborated, "there was not such a lack of evidence of [Ms. Taylor's] guilt that a trier of fact could infer that [Deputy Taylor] pursued [Ms. Taylor's] prosecution with the knowledge that [she] was not guilty and so intended to do wrong." *See id.* at 74-75. As we have

---

[10] Ms. Taylor's claim that Deputy Taylor committed perjury in his deposition testimony is beside the point. There is no evidence that he presented perjured testimony in obtaining the warrants.

25

explained, we are constrained to conclude that at least arguable probable cause existed to support Deputy Taylor's decision to obtain the arrest warrants.

### 3.    Assault and Battery

Ms. Taylor's only contention on appeal regarding her assault-and-battery claim is that actual malice may be inferred based on "a total lack of probable cause" to arrest. As explained above, however, Ms. Taylor's arrest was supported by at least arguable probable cause. For that reason, Deputy Taylor was permitted to make an arrest and to use some degree of force in making the arrest. The facts of this case are not sufficient to show that Deputy Taylor deliberately intended to commit a wrongful act. *See Selvy v. Morrison*, 665 S.E.2d 401, 405-06 (Ga. Ct. App. 2008).

### C.    *State-Law Malicious-Prosecution Claim against Wammock*

Finally, Ms. Taylor argues that Wammock should not have been dismissed from the case because the evidence was sufficient to show that Wammock urged Ms. Taylor's arrest. She cites evidence that Wammock disliked Ms. Taylor and that Wammock told a mutual friend two weeks before Ms. Taylor's arrest that she (Wammock) was going to send that "bitch" back to jail, referring to Ms. Taylor.

Ms. Taylor's theory of liability appears to be that Wammock gave information to Deputy Taylor that she knew to be false. *Willis v. Brassell*, 469 S.E.2d 733, 737 (Ga. Ct. App. 1996) ("A person may be liable where he gave

information [to the investigating officer] which he knew to be false and so unduly influenced the authorities.") (internal quotation marks omitted).  However, there is no evidence in the record to show that Wammock did not receive harassing and threatening phone calls from a restricted number or that Wammock did not honestly believe that Ms. Taylor was the caller, particularly when evidence that Wammock received calls from an unidentified number exists.  It is simply too speculative to assume that Wammock fabricated the allegations against Ms. Taylor for the purpose of sending Ms. Taylor to jail.  Ms. Taylor has identified no authority from Georgia courts with similar facts indicating that Wammock could be held liable in these circumstances.  Accordingly, we affirm the district court's dismissal of Ms. Taylor's claim against Wammock.

## V.

For the reasons stated, we affirm in all respects the judgment of the district court in favor of the defendants.

**AFFIRMED.**