# United States Court of Appeals

### For the Eighth Circuit

_____

No. 18-2416

_____

Dollar Loan Center of South Dakota, LLC, doing business as Dollar Loan Center

*Plaintiff - Appellee*

v.

Bret Afdahl, individually and in his official capacity as director of the South Dakota Division of Banking

*Defendant - Appellant*

_____

No. 18-2497

_____

Dollar Loan Center of South Dakota, LLC, doing business as Dollar Loan Center

*Plaintiff - Appellant*

v.

Bret Afdahl, individually and in his official capacity as director of the South Dakota Division of Banking

*Defendant - Appellee*

_____

Appeals from United States District Court
for the District of South Dakota - Pierre

_____

Submitted: June 12, 2019
Filed: August 14, 2019

_____

Before LOKEN, KELLY, and ERICKSON, Circuit Judges.

_____

ERICKSON, Circuit Judge.

Dollar Loan Center ("DLC") and four of its branches were previously licensed as money lenders by the South Dakota Division of Banking ("Division"). On September 13, 2017, Bret Afdahl, Director of the Division, sent DLC a "Cease and Desist and License Revocation Order." This order required DLC to: (1) immediately stop lending money in South Dakota; (2) to notify all consumers who had loans issued after June 21, 2017, that the loans were void and uncollectible; and (3) to surrender all of its money lending licenses and return them to the Division. DLC commenced this action under 42 U.S.C. § 1983 against Afdahl, alleging that license revocation without a pre-deprivation hearing deprived DLC of its procedural due process rights under the Fourteenth Amendment. Afdahl appeals the district court's denial of absolute or qualified immunity and its decision that the quick action exception to a pre-deprivation hearing was not applicable. After careful review of the record, we conclude that Afdahl is entitled to qualified immunity. We reverse with directions to enter judgment in favor of Afdahl on the basis of qualified immunity.

I.    **Background**

In South Dakota, the Division of Banking is administered under the direction and supervision of the Department of Labor and Regulation and its Secretary. S.D. Codified Laws § 51A2-2. The Division is vested with the authority to control and supervise banking activities within the state and is to exercise its "quasi-judicial, quasi-legislative, advisory, and other nonadministrative functions independently."

Id. Under Chapter 54-4, the Director of the Division is responsible for approving or denying license applications and renewals. S.D. Codified Laws §§ 54-4-41, 54-4-45. If the Director determines that a licensee is engaging in a practice that fails to conform to the law or a commission rule, order, or condition, he may issue a cease and desist order. S.D. Codified Laws § 54-4-48. He is also authorized to "condition, deny, decline to renew, suspend for a period not to exceed 6 months, or revoke a license for 'good cause.'" Under South Dakota's Administrative Procedure and Rules, unless an agency finds that public health, safety, or welfare require emergency action, a license cannot be revoked or suspended unless the agency has given notice and afforded the licensee an opportunity to be heard. S.D. Codified Laws § 1-26-29.

In July 2010, DLC submitted money lending license applications to the Division for its main place of business in Sioux Falls and a branch location in Rapid City. The applications stated that the businesses would not provide short term consumer loans, payday lending, or title loans as defined under South Dakota Law. A "short term loan" is any loan with a duration of six months or less. S.D. Codified Laws § 54-4-36. Based on the information provided in the applications, the Division approved money lending licenses to DLC. DLC submitted the required annual renewal applications from 2011 to 2016. With the exception of the year 2012, DLC affirmed on its renewal applications that there had not been any substantive changes to the loan products offered since the last application or renewal. In 2012, DLC informed the Division that it was changing from a 52 week to a 65 week amortized loan product.

In 2017, DCL submitted money lending license applications for branches in Sioux Falls, Aberdeen, and Watertown, South Dakota. These applications also indicated that the businesses would not provide short term consumer loans, payday lending, or title loans.

-3-

Before July 1, 2017, DLC originated and serviced unsecured loans ranging from $100 to $2,000. The customer was required to make weekly interest payments for 51 weeks (beginning in 2012, a period of 64 weeks) and then on the final week a balloon payment consisting of total principal plus interest. The annual percentage rate ("APR") on these loans varied from 259 percent to 492 percent. The rate varied based on the loan amount and whether the customer had a checking account. In November 2016, DLC was forced to change its loan product after Initiated Measure 21 was approved by the voters and became law. The measure set a maximum finance charge for all money lenders licensed under South Dakota law. Total interest, fees, and charges could not be greater than an APR of 36 percent. S.D. Codified Laws § 54-4-44 prohibited money lenders from evading the rate limitation by imposing other charges or fees.

The Division understood that DLC would not make additional loans after the measure went into effect. However, in a letter dated July 12, 2017, DLC disputed the Division's understanding and stated it had informed the Division that DLC "planned to maintain its money lending license for each of its locations and that it reserved the right to lend money and service loans consistent with South Dakota law."

DLC informed the Division that beginning sometime after July 1, 2017, it would begin using a new loan product. Upon reviewing the new product, the Division expressed concern to DLC in a letter dated July 7, 2017, that DLC's new loan product was attempting to use the late fee provision in its new loan contracts as a "device, subterfuge, or pretense to evade" the new law.[1] The Division informed

---

[1]South Dakota law provides:

54-4-44.1. Device, subterfuge, or pretense to evade maximum finance charge prohibited--Penalties. No person may engage in any device, subterfuge, or pretense to evade the requirements of § 54-4-44, including, but not limited to, making loans disguised as a personal

-4-

DLC that it would be conducting an examination within the next 30 days. The Division conducted a "targeted" examination on July 13, 2017, and a "full scope" examination on August 17-18, 2017.

The Division's investigation revealed that DLC's new loan product involved unsecured loans ranging from $250 to $1,000 with a seven day term, which under South Dakota law was a short term loan. The stated APR on the new loan product was between 35.87 percent and 35.98 percent and weekly late fees varied from $25 to $70 per week. The main difference between the new loan product and the previous loan product was the amount due the first week. On the new loan, the first payment included principal plus the interest. If the customer did not make the payment, a $70 late fee was imposed every seven days until the loan, all accrued interest, and late fees were paid in full. This new loan product with a substantially higher payment due the first week caused the loan portfolio's delinquency rate to exceed 50 percent. After late fees are included in the APR as finance charges, the Division determined that the APR ranged from 300.86 percent to 487.64 percent.

The Division also discovered that between July 1, 2017, and August 17, 2017, late fees accounted for 90.22 percent of DLC's total income. The Division concluded that DLC's new loan product was a short term consumer loan; that the late fees

property sale and leaseback transaction; disguising loan proceeds as a cash rebate for the pretextual installment sale of goods or services; or making, offering, assisting, or arranging a debtor to obtain a loan with a greater rate of interest, consideration, or charge than is permitted by this chapter through any method including mail, telephone, internet, or any electronic means regardless of whether the person has a physical location in the state. Notwithstanding any other provision of this chapter, a violation of this section is subject to the penalties in § 54-4-44.

charged are anticipated fees that must be included in the finance charge calculation; and that the product violated the maximum APR allowed to be charged under South Dakota law. In light of these findings, Director Afdahl issued on September 13, 2017, a cease and desist order and a license revocation order. He revoked DLC's money lending licenses and also ordered DLC to stop engaging in the business of lending money in South Dakota; to notify consumers that any loan made after June 21, 2017, was void and uncollectible; and to surrender immediately the money lending licenses and return them to the Division.

Fifteen days after issuing his findings and revocation order, Afdahl issued a limited stay. The stay allowed DLC to continue servicing any loans originated before November 16, 2016, so long as the servicing of the loans was not in violation of South Dakota law. On October 3, 2017, the Division served on DLC's attorney a notice of hearing to address the status of DLC's money lending licenses. The hearing was set for October 17, 2017. The notice identified the following issues: (1) that DLC was originating and servicing short terms loans when it had not been authorized by the Division to do so; (2) the loans offered by DLC after June 21, 2017, were designed to incur late fees and as such were considered anticipated fees that were required to be included in the finance charge calculation; and (3) DLC had violated statutes pertaining to consumer credit and engaged in unfair practices involving its lending activity. DLC requested a continuance and questioned whether the hearing was "jurisdictionally appropriate" since it believed the Division had taken "final action." No hearing was held.

DLC commenced this action, alleging Afdahl violated DLC's clearly established right to procedural due process by revoking DLC's money lending licenses without a pre-deprivation hearing. Afdahl moved to dismiss for failure to state a claim. The parties also filed cross-motions for summary judgment. The district court denied Afdahl's motion to dismiss, finding he was not entitled to absolute immunity because his decision to revoke the money lending licenses prior

to affording DLC a hearing exceeded the statutory authority vested by South Dakota law and was not the type of conduct that absolute immunity was intended to protect. The court denied Afdahl's motion for summary judgment, determining that he was not entitled to qualified immunity and the quick action exception obviating a pre-deprivation hearing did not apply. It granted partial summary judgment in favor of DLC as to the 15 day period between Afdahl's revocation order and when he issued the stay, noting that "damages appear to be limited in this case" and cautioning the parties that "nothing in this opinion should be taken as an endorsement of the extent of DLC's damages claims." The district court later clarified when it denied DLC's motion to reconsider that the issue of whether there was a deprivation outside of the 15-day period was an unresolved fact question. Afdahl appeals the district court's denial of immunity and ruling that the quick action exception permitted him to act without a pre-deprivation hearing.[2]

## II.    Discussion

We review the denial of qualified immunity de novo. Dadd v. Anoka Cty., 827 F.3d 749, 754 (8th Cir. 2016) (quoting Hager v. Ark. Dep't of Health, 735 F.3d 1009, 1013 (8th Cir. 2013)). To warrant reversal, Afdahl must show that he is entitled to immunity on the face of the complaint. Id. (quoting Bradford v. Huckabee, 394 F.3d 1012, 1015 (8th Cir. 2005)). This requires us to analyze whether DLC "has stated a plausible claim for a violation of a constitutional or statutory right [of which a reasonable person would have known] and whether the right was clearly established at the time of the alleged infraction." Hager, 735 F.3d at 1013 (citing Powell v. Johnson, 405 F.3d 652, 654–55 (8th Cir. 2005)). "Absent either a clearly established right or a constitutional violation, qualified immunity applies." Dillard v. City of

_____

[2]DLC filed a cross-appeal on the issue of whether the district court erred in finding the constitutional deprivation lasted only 15 days. DLC has not pursued its cross-appeal after the court issued its order on DLC's motion to reconsider.

Springdale, Arkansas, No. 17-3284; No. 17-3287, __ F.3d __ , 2019 WL 3049010, at *3 (8th Cir. July 12, 2019).

DLC's alleged constitutional claim is that Afdahl deprived it of a procedural due process right when Afdahl revoked DLC's money lending licenses on September 13, 2017, before holding a pre-deprivation hearing. In a qualified immunity analysis, "a right is 'clearly established' if the 'contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Sutton v. Bailey, 702 F.3d 444, 447 (8th Cir. 2012) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).

The district court, relying on Freeman v. Blair, 793 F.2d 166 (8th Cir. 1986) (Freeman I) and Freeman v. Blair, 862 F.2d 1330 (8th Cir. 1988) (Freeman II), found that the right to a pre-deprivation hearing under these circumstances was clearly established. In Freeman I, we concluded that state officials who sought to perform warrantless campground inspections and then suspended the campground's operating license without a pre-deprivation hearing, despite lacking a factual basis to invoke the public welfare exception, were not entitled to qualified immunity. 793 F.2d at 178. After the decision was vacated and remanded by the Supreme Court, we reconsidered the qualified immunity question and concluded that even if objectively reasonable officials could have believed a warrantless search of the campground was constitutionally permissible, it does not follow that they could have believed a summary suspension of the campground license was constitutionally permissible. 862 F.2d at 1332.

We disagree with the district court's conclusion that procedural due process requires more than what the Division did and DLC's right to a pre-deprivation hearing was clearly established by Freeman. The process and procedure employed by the Division is distinguishable from that utilized by the officials in Freeman such that a reasonable official in Afdahl's position would not be on notice that he was

-8-

violating a clearly established right when he issued the combined cease and desist and revocation order in this case. Before taking adverse administrative action, the Division conducted an extensive examination of DLC's new loan product. Seven state banking officials were involved in examining DLC's operations. Three performed the onsite "target" examination in July, including the Deputy Director. They reviewed 20 "active" loans and several "denied" loans. Because the new loan product was only 10 days old at the time and only loans originated from July 3 to July 5 could contractually be deemed past due, the examiners determined that additional information and a larger sample was needed to complete their investigation.

After the examiners determined that DLC's responses to follow-up written questions were incomplete or unresponsive, a two day examination was scheduled in August. In addition to the Deputy Director, three examiners not involved in the first examination participated in the second examination. DLC's regional manager and its lawyer, which the Division found unusual, were present during both examinations. The examiners selected 308 new loan products from the 633 short term loans that had originated from July 1 to August 17, 2017. Of the loans selected for review, 276 had a maturity date prior to August 17. The review demonstrated to the examiners that DLC was overwhelmingly reliant on late fees to generate revenue and that DLC was issuing short term loans without authorization to do so. After this intense investigation, the examiners reached the conclusion that DLC's loan product violated South Dakota law. Contrary to the officials' actions in <u>Freeman</u>, the procedures employed by the Division armed Afdahl with a substantial factual foundation upon which he based his legal conclusion that DLC was violating South Dakota's lending laws.

DLC's claim that it had no notice that it could not issue short term loans is disingenuous. DLC was aware that it had to notify the Division of any substantive changes to the loan products it offered. The renewal application inquired about substantive changes and DLC notified the Division in 2012 of a change when it

extended its amortization schedule from 52 to 65 weeks. Yet, the Division received DLC's new money lending license applications for branches in Aberdeen, Watertown, and Sioux Falls on June 1, 2017, approximately a month before DLC was to begin using its new short term loan product. In those applications, DLC indicated no short term loans were being provided. Despite being aware of its obligation, DLC never notified the Division of the substantial change in its loan product. DLC knew or should have known that it was providing a loan product inconsistent with the terms on the face of its applications.

It is indisputable that Director Afdahl acted within his authority when he issued the cease and desist order. South Dakota law permits summary cease and desist orders. The cease and desist order prohibited DLC from engaging in the business of lending money in South Dakota. DLC had sought approval from the Division to offer this single loan product. Without another approved product, DLC could not originate any new loans. While it would have been more precise to prohibit DLC from originating or servicing the new loan product, the potentially overbroad order was swiftly corrected. Approximately two weeks later, Afdahl issued a stay allowing DLC to continue to service any lawful loan originated before November 16, 2016. Although the Division requested a listing of unpaid loans originated before November 16, 2016, from DLC, the record does not appear to contain DLC's response, if any, to the request.

Afdahl's September 13, 2017, order also revoked DLC's money lending licenses. Before the revocation, DLC, through its regional manager and its counsel, had been given an opportunity to respond to several of the Division's concerns regarding DLC's new loan product. DLC presented written responses to the Division's questions. DLC disputes the Division's legal conclusions, not the data relied on by the Division, which was supplied by DLC. While a trial-like hearing was not conducted, due process has been described by the United States Supreme Court as a "flexible" concept. Mathews v. Eldridge, 424 U.S. 319, 334 (1976) (quoting

-10-

Morrissey v. Brewer, 408 U.S. 471, 481 (1972)).  In this case, there is no evidence that adverse administrative action against DLC's property interest was based on an erroneous factual basis.  It was Afdahl's responsibility to make a legal interpretation regarding the lawfulness of DLC's new loan product.  He did so only after an intense investigation allowing DLC's regional manager and counsel to participate in both on-site examinations and to respond to follow-up questions.  Under these circumstances where DLC was on notice that the Division was investigating the lawfulness of its new loan product, DLC was afforded an opportunity to provide additional information addressing the Division's concerns, and the revocation order had no more of an effect on DLC's business than the simultaneously issued cease and desist order, we conclude that DLC has not shown a procedural due process violation.

More importantly, qualified immunity is intended to give "government officials breathing room to make reasonable but mistaken judgments, and [to] protect[] all but the plainly incompetent or those who knowingly violate the law." Messerschmidt v. Millender, 565 U.S. 535, 546 (2012) (internal quotations omitted).  Even if Afdahl should have done something more before taking adverse action against DLC's money lending licenses, he made a reasonable mistake in the exercise of his official duties.  This is the type of mistake that the qualified immunity rule was intended to protect.  Viewing the evidence in the light most favorable to the complaint, we find DLC has failed to show a violation of a constitutional right that was clearly established.  Afdahl is entitled to qualified immunity.

## III.    Conclusion

For the foregoing reasons, we reverse the district court's denial of qualified immunity.  We direct the district court to enter judgment in favor of Afdahl on the basis of qualified immunity.

KELLY, Circuit Judge, concurring in the judgment.

Afdahl expressly states that, for purposes of appeal, he assumes that "DLC is normally entitled to a pre-deprivation hearing." In other words, he concedes that DLC was not afforded the pre-deprivation hearing that it would normally be entitled to. He argues that he is nonetheless entitled to qualified immunity either because the "quick action exception" applies—as there was a compelling state interest in taking immediate action—or because it was not clearly established that the quick action exception did not apply. See Moore v. Warwick Pub. Sch. Dist. No. 29, 794 F.2d 322, 327 (8th Cir. 1986) (noting "situations requiring quick action by the State when there is a compelling or overriding state interest in a summary adjudication" are exempt from the pre-deprivation hearing requirement). Whether Afdahl afforded DLC sufficient process *absent* the existence of circumstances that a reasonable official would conclude required immediate action to safeguard public welfare is not a question before us, so I would not reach it. But I concur in the result the court reaches because I agree that at the time Afdahl took the action he did with respect to the cease and desist order and the license revocation, it was not clearly established that the quick action exception did not justify the lack of a pre-deprivation hearing.

———————————————