NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0271n.06

No. 19-1287

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
May 14, 2020
DEBORAH S. HUNT, Clerk

CHRISTANNA BULLOCK,

    Plaintiff-Appellee,

v.

CITY OF DETROIT, et al.,

    Defendants,

WILLIAM MORRISON; JOSEPH CASTRO,

    Defendants-Appellants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

BEFORE: BATCHELDER, WHITE, and MURPHY, Circuit Judges.

MURPHY, Circuit Judge. The Detroit Police Department's "major violators unit" specializes in drug cases. Officer William Morrison, a member of the unit, has participated in more than 3,000 drug raids. During these raids he has shot about 80 to 90 dogs. This case, like another we recently decided, concerns one of those dogs. *See Smith v. City of Detroit*, 751 F. App'x 691, 693 (6th Cir. 2018). On September 2, 2015, Christanna Bullock took her granddaughter to an amusement park. That same day the major violators unit executed a search warrant at her home, following a controlled drug buy there two days before. The unit found no drugs, and Bullock was charged with no crimes. Yet Officer Morrison shot and killed Bullock's dog, Mandy.

Bullock sued Morrison and Officer Joseph Castro, the officer who applied for the warrant that led to this search. She asserted two Fourth Amendment claims: that Morrison used excessive force when shooting her dog and that a single controlled drug buy did not give Castro probable cause for the warrant. The district court denied the officers' requests for qualified immunity. On appeal, Morrison argues that Bullock lacked a constitutionally protected interest in Mandy because she was unlicensed. We have rejected this argument already and decline Morrison's invitation to reverse course now. *Id.* at 695–97. Morrison also challenges the district court's finding that circumstantial evidence created a jury question over whether Mandy charged at Morrison and so posed an imminent threat of harm. But we lack jurisdiction to consider this type of evidentiary challenge in this case's procedural posture. We find, by contrast, that a reasonable officer could believe that probable cause existed for the warrant that led to this search. So we affirm in part, reverse in part, and dismiss in part for lack of jurisdiction.

I

Bullock lived alone with her dog Mandy at her home in Detroit, Michigan. On August 31, 2015, a confidential informant told Officer Castro and his partner that individuals were selling drugs at several locations, including Bullock's home. This informant had given information to the major violators unit at least ten prior times, which had led to at least 20 drug-related arrests and the seizures of drugs and firearms. Castro thus considered the informant reliable and arranged for a controlled buy at Bullock's home. After giving the informant $10 or $20 for the transaction, Castro and his partner monitored the buy from an unmarked car parked a few houses down the street. Castro watched as the informant walked to Bullock's home, interacted for one or two minutes with an adult male who came to the door, and returned to Castro's car. Castro did not see the exchange of drugs for cash, but the informant came back with a folded lottery ticket containing

a substance that looked like heroin. Beyond watching the buy, Castro conducted no other surveillance of Bullock's home.

On September 1, after confirming that the substance was heroin, Castro used the controlled buy to get a search warrant for Bullock's home. His affidavit expressed his belief that the informant was reliable and discussed the unit's prior experiences with the informant and the resulting arrests and seizures. It also described the controlled buy, noting that Castro "observed the [informant] go directly to the target location, stay a short time, and then return directly to" Castro. A magistrate judge issued the warrant.

The next day, seven members of the major violators unit executed the warrant. The officers knocked on the door and announced their presence, but nobody answered. After an officer rammed the door, Morrison entered with Castro immediately behind. Both officers carried shotguns. Up to this point, neither Castro nor Morrison had heard or seen evidence of a dog, and the informant had not mentioned a dog at the residence either.

Just before or just after entering the house, Morrison saw Bullock's dog Mandy about 12 to 15 feet away. He thought the dog looked like a Pitbull, but Bullock claims Mandy was a Labrador Retriever. According to Morrison, the dog barked, showed her teeth, and charged snarling. Morrison yelled "dog" and fired two shots at Mandy. Castro, who was covering Morrison's "six," did not recall whether he heard the dog bark or growl and did not see the dog, but he heard Morrison's shout. Morrison noted that the wounded dog "squealed" and escaped to the basement leaving a trail of blood. The officers proceeded to secure the house. Morrison and another officer eventually reached the basement where (again according to Morrison) the dog stopped crying and started barking. Morrison says that Mandy approached the officers "kind of limping." He fired two more shots, this time killing the dog.

3

The house secure, the officers searched for drugs. They found none. The officers did confiscate two old handguns located in Bullock's bedroom. They left a copy of the warrant and a list of seized items, but did not mention the dog. Following official policy, Castro disposed of the dog at a landfill.

On the day of this search, Bullock had taken her granddaughter to Cedar Point, an amusement park in Sandusky, Ohio. When returning from the park that evening, Bullock received a call from her neighbor that her door was hanging wide open. She got home about an hour later to find her house in disarray. The shots from Morrison's shotgun had left holes in her bedroom door, dresser, and mattress as well as in her basement walls and bar. Bullock realized that her dog had been killed after speaking with neighbors who had heard the search and seeing the blood on her basement steps. She called the police, they came several hours later, and they told her that her house had been searched pursuant to a warrant.

Bullock says that Mandy had never previously bitten, attacked, or charged anyone; the dog would run away from strangers. She also has never been convicted of a crime, was not aware of drug sales from her home, and had never had the police called there before. Bullock did, however, catch someone that she knew to be a local drug dealer cutting through her yard about a month or so before the search. When discussing the confiscated guns, Bullock asserted that one was her uncle's antique German Luger from World War II, and the other was a "starter pistol" for relay races. She tried to get the Luger back, but both guns were destroyed.

Bullock brought a two-count complaint against Castro, Morrison, and the City of Detroit under 42 U.S.C. § 1983. She alleged that Castro's affidavit failed to establish probable cause to search her home and thus violated the Fourth Amendment's ban on unreasonable searches. She

added that Morrison used excessive force when shooting her dog and thus violated the Fourth Amendment's ban on unreasonable seizures.

Castro and Morrison sought qualified immunity, but the district court denied their request at the summary-judgment stage. *Bullock v. City of Detroit*, 2019 WL 698140, at *3–6 (E.D. Mich. Feb. 20, 2019). On Bullock's probable-cause claim, the court stated that Castro's "warrant affidavit contained significant misrepresentations and/or omissions." *Id.* at *6. Castro stated in his deposition that he watched the informant make the controlled buy from a car parked a few houses down, but he did not include that last detail in the warrant. *Id.* In addition, Castro's affidavit did not expressly concede that he lacked other evidence of drug trafficking at Bullock's home or that he had not conducted surveillance of Bullock's home before or after the controlled buy. *Id.* When disregarding these purported omissions, the district court concluded that the affidavit did not establish probable cause. *Id.* at *5–6.

The court also rejected Morrison's qualified-immunity request on Bullock's excessive-force claim. *Id.* at *3–5. It recognized that the police may shoot a dog that "constitute[s] an imminent threat from the perspective of a reasonable police officer at the time of the incident, without the benefit of hindsight." *Id.* at *4. Yet it held that a jury should decide whether Mandy posed such a threat. *Id.* While Morrison testified that the dog barked, snarled, and charged, "Castro stated that he did not see the dog charge or hear a dog bark or growl, but he heard Morrison say 'dog' and shots fired immediately thereafter." *Id.* Before Morrison yelled "dog," the court continued, nobody had heard or seen a dog. *Id.* at *5. And Bullock testified that "Mandy had never attacked, bit, or charged at anyone and, when the dog became frightened, she would go into the basement and hide." *Id.* Morrison himself conceded that Mandy had been "limping" when he

5

killed the dog. *Id.* This evidence, the court held, created a genuine dispute of material fact over whether Morrison faced an imminent threat from Mandy. *Id.*

II

Two established principles set the ground rules for this appeal. The first concerns the defense of qualified immunity. "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) (citation omitted). "To be clearly established," moreover, "a legal principle must have a sufficiently clear foundation in then-existing precedent." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018).

The second concerns jurisdiction. We typically have jurisdiction only over appeals from a district court's "final decisions." 28 U.S.C. § 1291. Under the "collateral order" doctrine, the Supreme Court has read this phrase to reach the denial of qualified immunity, even though that denial is not "final" in the literal sense because it does not end the litigation in the district court. *See Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). We have interpreted this precedent to give us jurisdiction only if a state actor seeks to appeal the district court's resolution of a legal question arising from the denial of qualified immunity. *Bey v. Falk*, 946 F.3d 304, 312 (6th Cir. 2019). We, for example, may review questions like whether "the defendant's actions violated a constitutional right or [whether] the right was clearly established." *DiLuzio v. Vill. of Yorkville*, 796 F.3d 604, 609 (6th Cir. 2015). Conversely, "[f]act questions, including questions of evidentiary sufficiency, are out of our hands" at this stage. *Bey*, 946 F.3d at 319.

Applying these standards, we conclude that the district court should have granted qualified immunity on Bullock's probable-cause claim. But we lack jurisdiction over most of the appeal of the denial of qualified immunity on Bullock's excessive-force claim.

1. *Probable Cause*. The Fourth Amendment protects "[t]he right of the people to be secure in their . . . houses . . . against unreasonable searches[.]" U.S. Const. amend. IV. Given our common-law tradition treating the home as "first among equals," *Florida v. Jardines*, 569 U.S. 1, 6 (2013), the Supreme Court has interpreted this language generally to require a warrant for a search of a private residence. *E.g.*, *Georgia v. Randolph*, 547 U.S. 103, 109 (2006). That requirement, in turn, triggers another Fourth Amendment command: "[N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Probable cause, the Supreme Court has "often" said, "is not a high bar." *Kaley v. United States*, 571 U.S. 320, 338 (2014); *Wesby*, 138 S. Ct. at 586. The task of the magistrate who reviews an affidavit requesting a warrant "is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *United States v. Christian*, 925 F.3d 305, 309–12 (6th Cir. 2019) (en banc).

If officers search a person's home based on a warrant issued without probable cause, the person may seek damages against the officers under § 1983. *See Peffer v. Stephens*, 880 F.3d 256, 263 (6th Cir. 2018). But qualified immunity protects the officers if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* (citation omitted). And the best evidence that officers would not have reasonably known that a warrant lacked probable cause is "the fact that a neutral magistrate" issued it. *Messerschmidt v. Millender*, 565 U.S. 535, 546–47 (2012). To avoid the qualified-immunity defense in this setting, therefore, a plaintiff must show that "it is obvious that no reasonably competent officer would have concluded that a warrant should issue." *Id.* (citation omitted). Put differently,

an officer's reliance on the magistrate's probable-cause finding must have been not just "mistaken," but also "plainly incompetent." *Id.* at 553 (citation omitted).

Bullock seeks to overcome this qualified-immunity defense with what she says is a clearly established legal rule: "a single controlled buy at a particular location by itself does not establish probable cause to search the location." Because that is all Castro and Morrison had, her argument goes, they acted plainly incompetently. The problem with this argument is that Bullock's proposed rule is not "clearly established." *See Wesby*, 138 S. Ct. at 589–90. To the contrary, our cases reject a bright-line rule that a single controlled buy cannot create probable cause. *See, e.g.*, *United States v. Archibald*, 685 F.3d 553, 555, 557 (6th Cir. 2012); *United States v. Pinson*, 321 F.3d 558, 560–61, 562–65 (6th Cir. 2003). In *Archibald*, for example, a warrant affidavit stated "that an informant made a controlled purchase of narcotics while under police surveillance, and it further describe[d] the officers' arrangements for the controlled purchase." 685 F.3d at 557. We found that this information sufficed, interpreting our cases as holding "that a single controlled purchase is sufficient to establish probable cause to believe that drugs are present at the purchase location." *Id.* at 558. Under this precedent, the officers in this case are entitled to qualified immunity because they could reasonably believe that they had probable cause based on the controlled buy. *Messerschmidt*, 565 U.S. at 547. That conclusion, in turn, obviates any need for us to decide whether probable cause existed. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

The cases on which Bullock relies do not change things. Her two Sixth Circuit cases found probable cause lacking for reasons not implicated here. *See United States v. Hython*, 443 F.3d 480, 486 (6th Cir. 2006); *United States v. Weaver*, 99 F.3d 1372, 1378–80 (6th Cir. 1996). In *Hython*, "the affidavit offer[ed] no clue as to when this single controlled buy took place." 443 F.3d at 486. That omission, we held, rendered the buy "stale" because it could have happened

months before the warrant request. *Id.* at 486–87. Here, by contrast, the affidavit stated that the controlled buy occurred the day before the magistrate issued the warrant.

In *Weaver*, an informant bought marijuana from the defendant at his home without any police surveillance and then met with the police the next day to discuss the transaction (it is not clear from the opinion whether the informant turned over the drugs at that time). 99 F.3d at 1375. Yet *Weaver* does not address whether probable cause may arise from a single controlled buy. As we explained, the affidavit *omitted* the fact of the informant's purchase, stating only that a reliable informant had seen the defendant at his home in the last three days possessing marijuana for distribution. *Id.* at 1378. Here, by contrast, the affidavit described the controlled buy, noting that Castro checked the informant for drugs beforehand, saw the informant return with what appeared to be heroin, and tested the substance to confirm it was heroin. Not only that, our en banc court has since held that *Weaver* "is limited to the facts of that case." *United States v. Allen*, 211 F.3d 970, 974 (6th Cir. 2000) (en banc). *Weaver*'s facts (an affidavit that does not mention a controlled buy) say nothing about this case's facts (an affidavit that does mention a controlled buy).

Bullock's other cases do not help her either. Two of them support Castro and Morrison. While the First Circuit rejected a bright-line rule that a single controlled buy always *creates* probable cause (a rule 180-degrees from Bullock's), the court still held that the government established probable cause based on an affidavit similar to Castro's affidavit in this case. *See United States v. Khounsavanh*, 113 F.3d 279, 285–86 (1st Cir. 1997); *see also United States v. Cooper*, 692 F. Supp. 2d 884, 888–90 (M.D. Tenn. 2010). That leaves Bullock with a magistrate judge's report and recommendation that does support her position. *See United States v. Smith*, 2004 U.S. Dist. LEXIS 32470, at *7–11 (E.D. Mich. May 28, 2004). But the district court did not adopt the relevant portion of the report. *See United States v. Smith*, 2004 U.S. Dist. LEXIS 32469, at *9–10

9

(E.D. Mich. July 13, 2004). It falls well short of creating the "settled law" that Bullock needs. *Wesby*, 138 S. Ct. at 589 (citation omitted).

Unable to show a violation of clearly established law based on the affidavit's contents, Bullock turns to a different argument. She contends that Castro recklessly omitted material facts from the affidavit. In this qualified-immunity context, a plaintiff must establish two things to support a claim that officers violated the Fourth Amendment by making false statements in, or omitting material facts from, a warrant affidavit. *See Butler v. City of Detroit*, 936 F.3d 410, 418 (6th Cir. 2019) (discussing *Vakilian v. Shaw*, 335 F.3d 509, 517–19 (6th Cir. 2003)); *see also Mays v. City of Dayton*, 134 F.3d 809, 815 (6th Cir. 1998). First, a plaintiff must present "substantial" evidence proving that the testifying officer did more than negligently include a false statement or make a material omission. *Vakilian*, 335 F.3d at 517. The plaintiff instead must show that the officer "stated a deliberate falsehood or showed reckless disregard for the truth." *Id.* When a claim hinges on alleged omissions, moreover, "[t]he mere existence of omissions alone is ordinarily not enough to make this strong preliminary showing." *Hale v. Kart*, 396 F.3d 721, 727 (6th Cir. 2005). Second, the plaintiff must show "that the allegedly false or omitted information was material to the finding of probable cause," meaning "that the judge would not have issued the warrant without the allegedly false material." *Vakilian*, 335 F.3d at 517.

Bullock cannot get past the first step. She argues that one sentence in Castro's affidavit was a misrepresentation: Castro said that he "observed the [informant] go directly to the target location, stay a short time, and then return directly to [Castro]." Her ground for thinking this statement a falsehood? She argues that the affidavit omitted the location from which Castro watched the informant. In his deposition, Castro clarified that he was parked "a few," "[m]aybe three to four," houses away during the buy. According to Bullock, the omission of his location

from the affidavit was material because unless he "had parked the vehicle directly in front of [her] residence, it was impossible for [him] to see what, if anything, transpired at the front door[.]" Yet Bullock cites *no* evidence to support this argument that Castro could not see her front door from where he was parked a few houses down. In his deposition, Castro testified that he watched the informant walk from the undercover police car to the front door of Bullock's home, stay there for "one to two minutes possibly," and then return to the car. Even though he was parked a few houses down, he testified that he had an "uninterrupted visual" of the informant the whole time. This testimony comports with what the affidavit indicated: that Castro saw the informant "stay a short time." The immaterial omission from the affidavit of Castro's precise location is "not enough to make [the] strong preliminary showing" that our cases in this context require. *Hale*, 396 F.3d at 727. The omission does not create a jury question over whether Castro acted in "reckless disregard for the truth." *Butler*, 936 F.3d at 418 (citation omitted).

The rest of Bullock's alleged omissions were not omissions at all. She says that Castro's affidavit failed to expressly concede that he lacked other evidence of drug dealing at her home, including: (1) that Bullock's home had no history of drug trafficking; (2) that Bullock was not a known drug dealer; (3) that the confidential informant had not observed a prior drug transaction at the home; (4) that the informant had not been inside Bullock's home or seen drugs there; (5) that Castro had not conducted additional surveillance; or (6) that Castro had not attempted to arrange a second controlled buy. True enough. But Bullock identifies no case indicating that a police officer makes a recklessly misleading omission by failing to include concessions of all the additional investigative steps that the officer might have taken (but did not). Nor does she make any claim that Castro made the whole story up and that no controlled buy occurred at her house on the date in question. Instead, this argument simply rehashes her earlier argument that Castro lacked

11

probable cause based on the single controlled buy without further investigation. We have already explained why a reasonable officer could think that probable cause existed from the controlled buy. The district court thus was mistaken when it denied qualified immunity to Castro and Morrison on Bullock's probable-cause claim.

2. *Excessive Force*. The Fourth Amendment also protects "[t]he right of the people to be secure in their . . . effects . . . against unreasonable . . . seizures[.]" U.S. Const. amend. IV. An officer's use of deadly force against a person's dog qualifies as a "seizure" of the person's "effect." *See Brown v. Battle Creek Police Dep't*, 844 F.3d 556, 566 (6th Cir. 2016). (For the historical analysis on this point, *see Altman v. City of High Point*, 330 F.3d 194, 200–05 (4th Cir. 2003).) The critical question thus becomes whether an officer's use of deadly force against a dog was "unreasonable." We have held that "a police officer's use of deadly force against a dog while executing a warrant to search a home for illegal drug activity is reasonable under the Fourth Amendment when, given the totality of the circumstances and viewed from the perspective of an objectively reasonable officer, the dog poses an imminent threat to the officer's safety." *Brown*, 844 F.3d at 568. In this appeal, the parties do not dispute (and so we may assume) that these rules qualify as sufficiently specific clearly established law for qualified-immunity purposes. *Cf. Richards v. City of Jackson*, 788 F. App'x 324, 331–32 (6th Cir. 2019).

Instead, the parties dispute the facts. On one hand, Officer Morrison stated in his deposition that Mandy barked, growled, and charged snarling at him after the officers breached Bullock's front door. He adds that Bullock did not witness the officers' search and that he provided the only eyewitness account of the charge. Morrison would be entitled to qualified immunity under his version of the facts. His conduct would have comported with the Fourth Amendment even without qualified immunity because the dog would have "pose[d] an imminent threat to the officer's

safety." *Brown*, 844 F.3d at 568. On the other hand, Bullock relies on circumstantial evidence to argue that Mandy did not bark, growl, or charge snarling at Morrison and yet Morrison shot the dog anyway. Among other things, none of the officers had heard or seen Mandy while they shouted their presence and gained entry by ramming the door. In addition, taking the facts in the light most favorable to Bullock, Castro did not see or hear Mandy before Morrison shouted and shot the dog. And, when Morrison shot Mandy a second time, he concedes that the dog was "limping." More generally, Mandy had never previously charged anyone and typically hid from strangers. Morrison has not disputed that he would have violated clearly established law by twice shooting Mandy under Bullock's version of the facts.

The district court held that Bullock's circumstantial evidence created a genuine issue of material fact over whether "Morrison acted reasonably in shooting and killing the dog"—that is, over whether the dog charged him. *Bullock*, 2019 WL 698140, at *5. Morrison asks us to examine the record ourselves and reach our own decision on whether the evidence could support Bullock's factual claim. But this "question[] of evidentiary sufficiency" is "out of our hands" in the interlocutory posture of this appeal. *Bey*, 946 F.3d at 319. We may not "decide an appeal challenging the district court's determination of evidence sufficiency, *i.e.*, which facts a party may, or may not, be able to prove at trial." *DiLuzio*, 796 F.3d at 609 (internal quotation marks omitted). With one exception, that is what Morrison has asked us to do here.

The exception: Besides appealing the district court's finding about the disputed facts, Morrison ends with a purely legal argument. He asks us to hold either that Bullock's unlicensed dog was contraband and thus unprotected by the Fourth Amendment or that Morrison is entitled to qualified immunity on this basis. We have jurisdiction to decide these legal questions. *See id.*; *e.g. Smith v. City of Detroit*, 751 F. App'x 691, 695–97 (6th Cir. 2018). Yet, no matter how we

would approach them as an original matter, *cf. Smith*, 751 F. App'x at 698–703 (Batchelder, J., dissenting), we have rejected similar arguments three times now, *see id.* at 695–97 (majority op.); *see also Bullman v. City of Detroit*, 787 F. App'x 290, 300–01 (6th Cir. 2019); *Richards*, 788 F. App'x at 331–32. None of these unpublished decisions is binding, Morrison responds. But he offers no new arguments in support of his position, and we see no basis for changing course now.

\* \* \*

We affirm in part, reverse in part, dismiss in part for lack of jurisdiction, and remand for proceedings consistent with this opinion.

**HELENE N. WHITE, Circuit Judge, concurring in part and dissenting in part**.

I concur in the majority's discussion and disposition of Bullock's claim regarding Mandy. I dissent, however, from the reversal of the district court's denial of qualified immunity regarding the search. I would instead vacate and remand for reconsideration under *Mays v. City of Dayton*, 134 F.3d 809 (6th Cir. 1998) and *Hale v. Kart*, 396 F.3d 721 (6th Cir. 2005).

Castro argues that summary judgment is appropriate because the officers executed the search pursuant to a valid warrant. He also argues he is entitled to qualified immunity because the warrant was based on his affidavit, which, he asserts, did not contain intentional or reckless misrepresentations. Bullock argues, in part, that Castro is not entitled to qualified immunity because he made material misrepresentations and omissions in his search-warrant affidavit.

In *Mays*, the Sixth Circuit set out a two-part test for determining whether officers are entitled to qualified immunity when a plaintiff alleges omissions in a search-warrant affidavit. The court must first ask "whether the plaintiff made a strong preliminary showing that the affiant intended to mislead the judge by omitting information from the affidavit." *Hale*, 396 F.3d at 726–27. "The mere existence of omissions alone is ordinarily not enough to make this strong preliminary showing." *Id.* "Under the second prong of the *Mays* test, if the omissions were critical to the finding of probable cause, we must deny qualified immunity." *Id.* In other words, "the affidavit should be reevaluated with the omitted portions included to see if those omitted items would change a probable cause determination." *Id.* "If disputed factual issues underlying probable cause exist, those issues must be submitted to a jury for the jury to determine the appropriate facts." *Id.* at 728. In such a case, we will "remand to the district court for submission of that factual matter to a jury with instructions on how those factual matters relate to the existence of probable cause." *Id.* at 727. If, however, "none of the facts are in dispute," this court "can make a final legal

determination on whether plaintiff meets the second prong of the *Mays* test as only legal questions would remain." *Id.* at 729.

Under the *Mays* test, the district court must first ask "whether the plaintiff made a strong preliminary showing that the affiant intended to mislead the judge by omitting information from the affidavit." *Id.* at 726–27. This court has recognized "the possibility that strongly material omissions could provide evidence of an intention to mislead." *Id.* at 727.

Castro's affidavit states:

On 08/31/15, Affiant met with SOI #3003 to formulate a plan to attempt to make a controlled purchase of Narcotics from 17151 Asbury Park (target location). The SOI was searched for money and drugs with none being found and issued a sum of U.S. currency with which to attempt to make the purchase. Affiant observed the SOI go directly to the target location, stay a short time, and then return directly to affiant. The SOI then turned over a quantity of suspected heroin, which the SOI indicated was purchased from the above-described seller. The SOI was again searched for money and drugs with none being found.

Affiant conveyed the suspected heroin to the Narcotic Section where a preliminary test proved positive for the presence of heroin. Affiant sealed the heroin into LSF#N02914711.

R. 26-13, PID 389. The affidavit also contains a brief description of the alleged drug seller: "B/M: 45-50 yoa: 5′9, 170 pounds, medium complexion, salt & pepper hair." *Id.* at 387.

The majority states that Bullock does not "make any claim that Castro made the whole story up and that no controlled buy occurred at her house on the date in question." Maj. Op. at 11. However, in her amended complaint, Bullock alleged that the search warrant "was based on the sale of drugs by a forty-five to fifty year old African-American male weighing approximately 170 pounds and at an approximate height of 5 feet 9 inches" but that no such person "resided at Plaintiff's residence" and on the date in question she was the only one in the residence. R. 8, PID 35. This is fairly construed as an allegation that the facts asserted in Castro's affidavit were so inconsistent with the facts known to Bullock as to constitute deliberate fabrications. During the

summary judgment hearing before the district court, defendants' counsel acknowledged, "[T]he Plaintiff alleges we lied in the affidavit in support of the search warrant and therefore manufactured probable cause." R. 31, PID 639. And in her brief to this court, Bullock argues that Castro omitted substantial and material facts from his affidavit, and that Castro's statement that he "observed the SOI go directly to the target location, stay a short time, and then return directly to affiant" was a misrepresentation. Appellee's Br. at 32, 41–42.

There is substantial evidence in the record to support Bullock's contention that Castro lied. According to Bullock, unless "Castro had parked the vehicle directly in front of Ms. Bullock's residence, it was impossible for them to see what, if anything, transpired at the front door." *Id.* at 42. Additionally, Bullock testified that she stopped working due to injuries roughly one month before the raid and that she "was always at home." R. 26-2, PID 264. Bullock further testified that the only other person with a key to her home was her daughter, and that nobody matching the description in Castro's affidavit of the alleged seller visited her home in the days or weeks before the raid. Bullock also testified that drugs were not sold in her home at any time. Further, as the majority notes, the raid revealed no drugs or evidence of trafficking, and Bullock was not charged with any crime. This evidence calls into question whether a controlled buy actually took place at Bullock's home and the truthfulness of Castro's representations in his affidavit. Castro's omissions, Bullock's testimony contradicting the affidavit, and the absence of any evidence of drug trafficking can be seen as creating the required strong preliminary showing that Castro intended to mislead the issuing magistrate.

Even if we assume that the controlled buy occurred, it is unclear from the affidavit and Castro's testimony what Castro saw for himself. It is unclear if Castro saw that the alleged seller was inside Bullock's home, if he inferred this from what he was able to see, if he relied on the

informant's explicit statements, or if he inferred the alleged seller was in the home based on the informant's other statements.

The district court, however, did not consider *Mays* and its progeny, address the first prong of the *Mays* test, or examine whether the evidence is sufficient to determine that Castro intended to mislead the issuing magistrate. I would therefore vacate and remand for further proceedings so that the district court may address the *Mays* inquiries.

"Under the second prong of the *Mays* test, if the omissions were critical to the finding of probable cause, we must deny qualified immunity." *Hale*, 396 F.3d at 727. In other words, "the affidavit should be reevaluated with the omitted portions included to see if those omitted items would change a probable cause determination." *Id.* The court must look to the "totality of the circumstances" to determine if the affidavit is "bare bones" or "sufficient." *United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 2000).

In *United States v. Weaver*, 99 F.3d 1372, 1374 (6th Cir. 1996), this court considered whether an affidavit supporting a "search warrant contained sufficient particularized facts from which the issuing magistrate could find a substantial basis for probable cause." After a single controlled buy of marijuana using a confidential informant, the officer "prepared a preprinted form affidavit" indicating the officer's belief that Weaver was "keeping a quantity of *marijuana* for the purpose or with the intention of unlawful possession, sale or transportation thereof." *Id.* at 1375. During the subsequent raid on Weaver's home, officers "found a quarter-ounce of marijuana but uncovered no other evidence of possession, distribution, or growth of marijuana on the property. . . . The authorities did not charge Weaver with any marijuana-related offenses." *Id.* at 1376. This court concluded that the affidavit "failed to provide sufficient factual information for a finding of probable cause." *Id.* at 1380. In *Allen*, this court summarized the defects of the *Weaver* affidavit:

In finding the affidavit insufficient to establish probable cause for the warrant to issue, reversing the district court, the *Weaver* panel noted that the stated purpose of the search was to find evidence of suspected drug dealing; yet the affidavit itself had contained no information about the purchase the CI was supposed to have attempted, nor about the quantity of marijuana he observed, nor any other facts which would support a belief that drugs were being held in the house for sale. As this court observed of *Weaver* in another case, what was lacking in the *Weaver* affidavit was any indication of probable cause to suspect drug *trafficking*, the offense for which the warrant was expressly being sought. *See United States v. Smith*, 182 F.3d 473, 480 (6th Cir. 1999). But that was not in itself fatal, since an affidavit need only provide probable cause to believe a search will uncover evidence of some wrongdoing, without need for further specificity. *See United States v. Anderson*, 923 F.2d 450, 457 (6th Cir. 1991) (holding "that knowledge of the precise crime committed is not necessary to a finding of probable cause provided that probable cause exists showing that a crime was committed by the defendants"). What was finally fatal in the *Weaver* affidavit was its lack of probable cause to believe any marijuana previously observed by the CI would be left to be discovered by a search, for there was no mention of the quantity of drugs observed. Nor was there any attempt to note behavior indicating ongoing sales.

211 F.3d at 974.

The relevant facts in the present case mirror those that were fatal in *Weaver*. As in *Weaver*, Castro's affidavit provided no "probable cause to believe any [heroin] previously observed by the CI would be left to be discovered by a search, for there was no mention of [any] quantity of drugs observed. Nor was there any attempt to note behavior indicating ongoing sales." *Id.* Further, although a CI's information does not always need to be "independently corroborated by police," *id.*, "corroboration of the tip through the officer's independent investigative work is significant," *Weaver*, 99 F.3d at 1377; *see also United States v. Archibald*, 685 F.3d 553, 557 (6th Cir. 2012) (noting that a sparse affidavit may support probable cause if it also includes corroborating information). Here, Castro cannot point to independent corroboration, investigation, or research.

Because of the lack of investigation and corroboration in the present case, the majority's reliance on *Archibald* is misplaced. In *Archibald*, this court recognized that it "must consider the veracity, reliability, and basis of knowledge of the informant's information" and that a sparse

affidavit may support probable cause if it also "includes sufficient corroborating information." 685 F.3d at 557 (quoting *United States v. Coffee*, 434 F.3d 887, 893 (6th Cir. 2006)). This court concluded that because the affidavit in question stated that "an informant made a controlled purchase of narcotics while under police surveillance" and "describe[d] the officers' arrangements for the controlled purchase," it contained "sufficient corroborating information." *Id.* It was the statements regarding the informant's participation "in past investigations and prosecutions . . . *combined* with the information regarding the officers' corroboration of the purchase" that permitted a finding of probable cause. *Id.* (emphasis added). Here, however, if the district court concludes that Castro did not see the alleged transaction and was unable to corroborate a purchase from the house, that, together with the absence of any evidence of ongoing drug trafficking, distinguishes this case from *Archibald*. Castro's inability to see or hear the alleged controlled buy while parked several houses away does not constitute "[c]lose observation or listening." *Surveillance*, Black's Law Dictionary (11th ed. 2019).

Although an officer who truthfully relates observations regarding a controlled purchase may reasonably believe that that purchase provides probable cause, one who has not observed the transaction would have no such reasonable belief.

In sum, I would affirm in part, dismiss in part for lack of jurisdiction, and vacate and remand for further proceedings regarding Castro's affidavit.